**BAMON CORP., d/b/a McCook Theatre, Plaintiff,**

v.

**CITY OF DAYTON, et al., Defendants.**

**No. C–3–89–445.**

United States District Court, S.D. Ohio, W.D.

Jan. 25, 1990.

Eugene Robinson, Dayton, Ohio, Lee J. Klein, Bradley J. Shafer, Okemos, Mich., for plaintiff.

J. Anthony Sawyer, City of Dayton Law Director, Ken Barden, Asst. City Atty., Dayton, Ohio, for defendants.

DECISION AND ENTRY GRANTING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (Doc. # 5), CONSIDERED AS A MOTION FOR SUMMARY JUDGMENT; JUDGMENT TO BE ENTERED FOR DEFENDANTS AND AGAINST THE PLAINTIFF; TERMINATION ENTRY

RICE, District Judge.

This case is before the Court on Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 5). Since matters outside of the pleadings have been proffered by the parties and considered by the Court, said Motion will be considered as a motion for summary judgment. For the reasons set forth below, the Court sustains said Motion in its entirety and grants Summary Judgment in favor of the Defendants and against the Plaintiff in this case. The following discussion constitutes the Court's findings of fact and conclusions of law.

On October 18, 1989, the City Commission of Dayton, Ohio, passed an ordinance (# 28028, enacting Sections 136.08–09 of the City's Revised Code of General Ordinances) (hereinafter "the Ordinance") regulating the design and occupancy of video booths located in "Amusement Arcades" and in which a "film or video viewing de-

vice" is used to exhibit material depicting certain enumerated sexual acts and bodily functions. Section 136.08 of the Ordinance defines an "Amusement Arcade" as "any place of business [other than hotels or motels] in which a film or video viewing service or devices are located for the use of [sic] entertainment of a person or persons patronizing the place of business." If the material depicted by "film or video viewing devices" within an amusement arcade depicts any of the enumerated subjects listed in Section 136.09(A), every video booth in which such material is shown must comply with the following requirements:

(1) Be visible from a well-illuminated continuous main aisle;

(2) Not be obscured by any curtain, door or other enclosure;

(3) All side or rear walls must be without holes or openings;

(4) Shall not be occupied by more than one patron at a time;

(5) Be illuminated by a light bulb of a wattage of no less than 25 watts.

Section 136.09(B). The Ordinance further provides that any "owner, operator, employee, or agent of an amusement arcade" who violates these requirements, and/or who allows or permits a violation thereof, and any patron who violates the one-patron-per booth requirement, is guilty of a first degree misdemeanor.[1]

Plaintiff Bamon Corporation ("Plaintiff") is an Ohio corporation which has been doing business as McCook Theatre at the same location in the City of Dayton for the past ten years. Doc. # 1 at 5.[2] Plaintiff's business, which consists of a theatre, boutique and "entertainment facility," *id.* at 6, primarily involves the sale of "Adult" books and magazines, the sale and/or rental and exhibition of "Adult" films and videotapes, and the exhibition of "Adult" live

entertainment. *Id.* at 4, 6. It is undisputed that the sexually explicit materials comprising Plaintiff's stock in trade are not classified as legally obscene; they are, therefore, protected under the first amendment. *Christy v. City of Ann Arbor*, 824 F.2d 489, 492 (6th Cir.1987) (citing *Young v. American Mini Theatres*, 427 U.S. 50, 73 n. 1, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976) (Powell, J., concurring)). There are thirty-five viewing booths on Plaintiff's premises in which a pre-set movie may been seen for a fee of twenty-five cents, four booths in which a videotape rented for five dollars may be viewed, and thirteen booths in which may be viewed live nude and/or semi-nude entertainment by a performer separated from the viewer by a glass plate. Doc. # 1 at 6–7. All of the booths in Plaintiff's establishment are totally enclosed, having neither windows nor other "viewing portholes," and have a full-length door which patrons may lock. *Id.* at 7.

The second reading of the Ordinance took place at a public meeting of the Dayton City Commission held on October 18, 1989. The Ordinance was passed by an unanimous vote of the Dayton City Commission at that meeting. During a telephone conference on December 6, 1989, the parties entered into a stipulation concerning the verified verbatim transcript of that portion of the proceedings devoted to the Ordinance, Doc. # 5, Defendants' Exhibit A ("Transcript"). By entry dated December 27, 1989, to which neither party has raised an objection, the Court characterized this stipulation as meaning that the Transcript "represents the universe of information that was *submitted* to the City Commissioners, along with the wording of the Ordinance in question," prior to the Commissioners' vote to enact the ordinance. Doc. # 6 (emphasis added).[3]

1. The full text of the Ordinance is set forth in the Appendix to this opinion.

2. Plaintiff's Complaint, Doc. # 1, has been verified by affidavit of the Plaintiff, Doc. # 8.

3. Since the assertion that the Ordinance is not supported by sufficient data to allow a determination that it furthers a "substantial government

interest" under the Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), is central to the Plaintiff's first amendment claims, a copy of the Transcript is set forth as an Appendix to this opinion.

Plaintiff's understanding of the parties' stipulation concerning the Transcript as meaning that the oral testimony at the second reading of

Plaintiff filed the instant action on November 13, 1989, seeking an order of this Court declaring the Ordinance unconstitutional and permanently enjoining its enforcement. Doc. # 1 at 13. Defendants in this action are the City of Dayton; Richard Clay Dixon, Mayor of the City of Dayton; James Newby, Chief of Police of the City of Dayton; and the Dayton City Commissioners ("Defendants"). Plaintiff alleges that the Ordinance violates the first, fourth, ninth, and fourteenth amendments to the United States Constitution, as well as "corollary" provisions under the Ohio Constitution, that it is preempted by the federal Video Privacy Protection Act, 18 U.S.C. § 2710, and that its enactment violated Plaintiff's procedural due process rights. This Court issued a Temporary Restraining Order on January 16, 1990, the effective date of the Ordinance, enjoining the enforcement of the Ordinance by the City of Dayton until January 25, 1990, or the announcement of its decision and reasoning in support thereof, whichever event occurred first. Doc. # 13.

The Court, having before it both Plaintiff's verified Complaint and the verified copy of the Transcript of the proceedings before the Dayton City Commission that accompanies Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, Defendants' Exhibit A, will treat Defendants' Motion as a Motion for Summary Judgment. Therefore, as an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

## A. *First Amendment Claims*

■ The core of Plaintiff's first amendment claims is the allegation that the Ordinance is unconstitutional because it is supported by neither a "compelling" nor a "substantial" government interest. Doc. # 1 at ¶¶ 21, 31. Plaintiff alleges that the Ordinance is "unsupported by any relevant facts upon which the City of Dayton could reasonably rely to justify its enactment." *Id.* at ¶ 21. As a result, Plaintiff alleges, the Ordinance violates Plaintiff's right to exhibit, and Plaintiff's patrons' right to view,[4] the films, video tapes and live enter-

---

the Ordinance was "the only 'support/evidence' that the City Commissioners had in front of [them] and/or considered in any manner relative to the determination of the existence of a 'problem' when they voted to enact the Ordinance," Plaintiff's Trial Memorandum, Doc. # 11, at 5, is overly broad. The same is true of Plaintiff's assertion, *id.* at 5 n. 2, that in view of said stipulation, the Court cannot take into account the City's findings (as set forth in the Preamble to the Ordinance) unless these findings are adequately supported by the testimony set forth in the Transcript.

**4.** Although not raised in Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, the issue whether Plaintiff has standing to assert its patrons' first amendment rights must be addressed by the Court. *FW/PBS, Inc. v. City of Dallas*, — U.S. —, —, 110 S.Ct. 596, 610, 107 L.Ed.2d 603 (1990) (citing *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)). The Supreme Court's decision in *Virginia v. American Booksellers Ass'n., Inc.*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), holding that owners of bookstores selling sexually-explicit, non-obscene materials have standing to assert the first amendment rights of their customers, *is dispositive* of this issue.

tainment available to customers in Plaintiff's viewing booths. *Id.* at ¶ 23.

The Court recognizes that enforcement of the Ordinance will impose an incidental burden on the forms of protected expression which comprise Plaintiff's stock in trade; but it is well settled that municipalities may impose reasonable time, place and manner restrictions upon protected expression, as long as the legislation imposing those restrictions is a) content-neutral; b) supported by and designed to serve a substantial government interest; and c) allows for reasonable alternative channels of communication. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986).[5] *See also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Dayton Ordinance does not ban the viewing of sexually explicit materials exhibited in viewing booths, nor does it restrict the availability of such materials. Therefore, it is properly analyzed as a time, place and manner regulation, *Renton,* 475 U.S. at 46, 106 S.Ct. at 928, as courts faced with constitutional challenges to "open-booth" ordinances have routinely held. *Williams v. City of Columbus,* No. 87–1440 (S.D. Ohio June 1, 1988) (Order denying motion for temporary restraining order and preliminary injunction), *aff'd.,* 872 F.2d 1030 (6th Cir.1989). *See also Berg v. Health and Hospital Corp.,* 865 F.2d 797, 802 (7th Cir. 1989); *Wall Distributors, Inc. v. City of Newport News,* 782 F.2d 1165, 1168 (4th Cir.1986); *Movie & Video World v. Board of County Commissioners,* 723 F.Supp. 695, 698 (S.D.Fla.1989); *Broadway Books, Inc. v. Roberts,* 642 F.Supp. 486, 490 (E.D.

Tenn.1986). It remains for the Court to determine whether, as Defendants assert, Doc. # 5 at 2–6, Dayton's Ordinance satisfies the *Renton* criteria.

### 1. Content neutrality

Plaintiff argues strenuously that the Ordinance is unconstitutional because its restrictions are based upon both the content of the entertainment offered within viewing booths *and* the impact of that content upon the viewer. Doc. # 7 at 8–9. The Court respectfully disagrees. *Renton's* content-neutrality analysis is controlling here. Dayton's Ordinance is similar to the zoning ordinance at issue in *Renton* (which governed the location of "adult" movie theatres only) in that it is directed only at those "amusement arcades" having video booths in which sexually explicit materials are exhibited. Under *Renton,* this differential treatment related to content does not preclude a determination that the Ordinance is content-neutral. *Renton* teaches that, as long as regulations "are *justified* without reference to the content of the regulated speech" they are, by definition, content neutral. *Renton,* 475 U.S. at 48, 106 S.Ct. at 928 (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)) (emphasis by *Renton* Court). Under *Renton,* regulations directed merely at the "secondary effects" associated with a particular category of speech meet this definition. The *Renton* Court distinguished between "restricting the message conveyed by a particular category of speech," *id.,* and regulating the effect that the businesses purveying that message have "upon

---

5. Since Plaintiff has argued this case under the *Renton* test for time, place and manner regulations, the Court has structured its analysis in terms of that test. The Court notes (and Plaintiff does not dispute) that the test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for regulations targeted at "mixed" activity (that which includes elements of both speech and "non-speech") is also applicable to the instant case. Under *O'Brien,* this sort of regulation is constitutional

 (1) if it is within the constitutional power of the Government;

 (2) if it furthers an important or substantial governmental interest;

 (3) if the governmental interest is unrelated to the suppression of free expression;

 (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. With the exception of the first *O'Brien* criterion (which arguably was assumed in *Renton* in the context of reviewing a zoning ordinance), *Renton's* test addresses precisely the questions to be raised in an analysis under *O'Brien.* In the Court's view, the Dayton Ordinance passes muster under either test.

their surroundings." *Id.* at 49 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 82 n. 6, 96 S.Ct. 2440, 2458, 49 L.Ed.2d 310 (1976) (Powell, J., concurring). Thus, "secondary effects" are regulatory targets (the subjects of regulation) wholly distinct from the direct impact of speech upon the listener. *See Boos v. Barry*, 485 U.S. 312, 319, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) (interpreting *Renton*).

It is noteworthy that the *Renton* Court looked to the terms of the ordinance before it, to determine how the ordinance was justified and thus to determine whether the ordinance was content-based on the one hand, or content-neutral (because it targeted secondary effects) on the other. 475 U.S. at 48, 106 S.Ct. at 929 ("The ordinance *by its terms* is designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] ... the quality of urban life,' not to suppress the expression of unpopular views") (emphasis added). This analysis prohibits inquiry into the motives of individual legislators. *Id.* at 48, 106 S.Ct. at 929 (citing *United States v. O'Brien*, 391 U.S. 367, 382–86, 88 S.Ct. 1673, 1681–84, 20 L.Ed.2d 672 (1968)). The Supreme Court recently reiterated that under *Renton* "regulations that apply to a particular category of speech *because the regulatory targets happen to be associated with that type of speech*" are properly characterized as content-neutral, as long as the justifications for regulation have nothing to do with content. *Boos v. Barry*, 485 U.S. at 319, 108 S.Ct. at 1163 (emphasis added).

The Dayton Ordinance fits this definition. The Ordinance *in terms* targets "carnal sexual activity" ... "particularly between males" ... in "closed peep show booths in adult bookstores," which activity, the City found, "contributes to the epidemic spread of sexually transmitted diseases, including AIDS." *See* Preamble to the Ordinance, Appendix A. It is thus justified by public health concerns. It is directed at secondary effects and not at the suppression of speech and is, therefore, content-neutral. *Accord Broadway Books*, 642 F.Supp. at 490; *Movie & Video World*, 723 F.Supp. at 699–700; *Suburban Video, Inc. v. City of Delafield*, 694 F.Supp. 585, 589 (E.D.Wis.1988)

### 2. Substantial Government Interest

As noted above, the gravamen of Plaintiff's first amendment claim is the contention that even if the Ordinance is content-neutral, *Renton*'s substantial government interest prong is not satisfied since there is no factual basis for the Ordinance's enactment. Doc. # 1 at ¶ 21.[6] The determination whether the Ordinance is supported by a substantial government interest requires review of the "facts and data" relied upon by the Dayton City Commission in enacting it. *Movie & Video World*, 723 F.Supp. at

6. Plaintiff cites the Sixth Circuit's decision in *Christy v. City of Ann Arbor*, 824 F.2d 489 (6th Cir.1987), *cert den.*, 484 U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988), for the proposition that "relevant evidence" of a problem must exist in order that the Ordinance pass muster under *Renton*. Plaintiff's Trial Memorandum at 24–25. In *Christy*, a zoning ordinance whose restriction was to restrict the location of "adult entertainment businesses" to approximately ²³/₁₀₀ of 1% of the City's land area was challenged by a prospective owner of an adult bookstore. 824 F.2d at 490. The *Christy* Court, citing its decisions in *Keego Harbor Co. v. City of Keego Harbor*, 657 F.2d 94 (6th Cir.1981) and *CLR Corp. v. Henline*, 702 F.2d 637 (6th Cir.1983), analyzed both the restrictiveness of the ordinance and the city's justification for imposing the restrictions. *Id.* at 492. The Court interpreted *Henline* to require proof that the city "was actually attempting to address the problem" [in that case, urban blight]. *Id.* at 491.

*Christy* is distinguishable from the instant case. Under *Christy*, the *Renton* "substantial government interest" requirement is met where the City sets forth "some relevant evidence to demonstrate that its ordinance was intended to address the secondary effects of adult businesses. The burden of proof is on the city to show that more than a rational relationship exists between the ordinance and this government interest." *Id.* at 493 (citations omitted). In *Christy* itself, there was no evidence at all of even the *assertion* by the City of *any* government objective in enacting the ordinance. The Ordinance, therefore, failed to satisfy *Renton*. By contrast, the Preamble to the Dayton Ordinance, the information given the Commissioners at the second reading of the Ordinance (see discussion below), and the colloquy at that meeting demonstrate the City's purpose in enacting its Ordinance.

698. Plaintiff contends that under *Renton* the City of Dayton must prove the existence of a "problem"—illicit sexual activity in the viewing booths of "adult" businesses—*in Dayton* "so as to warrant reliance upon the experiences of other municipalities." Doc. # 7 at 13. Plaintiff also contends that the transcript of the Ordinance's second reading shows that the Commission had no evidence of illicit activity occurring within the booths in Dayton's adult businesses, *id.* at 14, 16, and that the Commission's reliance upon the caselaw summarized by the City's Law Director at the second reading was unreasonable, *id.* at 12–13, since Defendants have stipulated that they do not rely on the inference that any Commissioner read the cases provided. Doc. # 6.

The Court disagrees with these contentions. *Renton* teaches that, in enacting regulations targeting the secondary effects of adult businesses, a city need not amass evidence independent of evidence either gathered by other cities or summarized in caselaw dealing with conditions existing in other locales. 475 U.S. at 51, 106 S.Ct. at 930. Plaintiff's argument that Dayton cannot rely on other cities' experience in the absence of factual proof of a comparable problem in Dayton was expressly rejected by the *Renton* Court as imposing on a city an "unnecessarily rigid burden of proof." *Id.* at 50, 106 S.Ct. at 930. In point of fact, at the time the Renton ordinance was first proposed, no businesses falling within the ambit of the ordinance were located in the City of Renton; hence, there was no *local* "problem" in the City of Renton. *Id.* at 52, 106 S.Ct. at 931.[7]

Under *Renton*, a city may rely on the experiences of other cities, and not conduct its own research into secondary effects, as long as whatever evidence the city relies upon is "reasonably believed to be relevant to the problem that the city addresses." 475 U.S. at 51–52, 106 S.Ct. at 930–31. Having perused the Transcript of the second reading of Dayton's Ordinance, the Court finds that the Dayton City Commission had such evidence before it when the Ordinance was passed. The problem the Ordinance is designed to address is "carnal sexual activity," (principally homosexual activity) within enclosed viewing booths in adult businesses *because of the effect such activity has upon the transmission of sexually transmitted diseases, including AIDS. See* Preamble to the Ordinance, Appendix A. The City Commission was presented not only with evidence that this problem exists in other locales whose open-booth ordinances have been held constitutional; the Commission also heard evidence of the existence of this problem in Dayton's adult businesses—more evidence, the Court would note, than the Renton City Council had about the City of Renton itself.

The Commission heard testimony from the City Law Director, Mr. Sawyer, who listed the decisions of courts in other jurisdictions, including Columbus, Ohio, that had upheld similar ordinances, and noted that there had been findings in these jurisdictions of sexual activity within enclosed booths in adult establishments.[8] Tran-

7. Plaintiff relies heavily upon the Ninth Circuit's recent opinion in *Acorn Investments, Inc. v. City of Seattle,* 887 F.2d 219 (9th Cir.1989), to support its interpretation of *Renton* as requiring that Dayton prove the existence of a "problem" within viewing booths in Dayton's adult establishments. *Acorn* held that an ordinance requiring the licensing of owners of commercial coin operated "panorams", or peepshows booths, did not further a substantial government interest as was required under *Renton. Id.* at 224. The Court so held because the City of Seattle's asserted justification for the ordinance, the need to use the license fees to defray law enforcement costs stemming from crimes committed within the "panorams," was not supported by evidence in the record of criminal activity with-

in the booths. *Id.* at 223–24. There is no suggestion in *Acorn* that the City of Seattle, in enacting its ordinance, was attempting to target a problem of national dimensions (as is the City of Dayton) by relying to any extent on the experiences of other cities. It is also noteworthy that the *Acorn* Court describes *Renton* as holding that the City of Renton *had* proven that adult theatres generate the secondary effects the Renton ordinance was intended to combat. *Id.* at 221.

8. As noted above, Defendants have stipulated that they do not rely on the inference that any of the Commissioners read the legal opinions furnished them by the City Law Director, Mr. Sawyer. Doc. # 6. Whether or not the Commissioners read these cases is *not* relevant to the

script at 1–2. The Commission was assured that it could rely on these findings, that these ordinances had been routinely held to be content-neutral, and that the rationale for the Ordinance was the need to combat the spread of AIDS and other sexually transmitted diseases. *Id.* Mayor Dixon conveyed his understanding that there was evidence from other cities that sexual activity occurred within enclosed booths, and that the City was acting to prevent such activities from occurring in Dayton, for reasons of public health and safety. *Id.* at 2.

The Commission also heard testimony from a member of its Department of Police, Major Long, that City police had been told by male prostitutes of sexual activity occurring within the booths in Dayton "adult" bookstores and theatres, and had also received citizen complaints about homosexual activity in relation to these establishments. *Id.* at 2–3. The City's Law Director testified that semen had been found on the walls of viewing booths in adult businesses in Columbus, Ohio, and said that "that per se obviously presents a health risk." *Id.* at 3. The Commission then heard testimony from three private persons. First, Plaintiff's counsel argued that the City's Law Director had misconstrued the cases he cited to the Commission and urged the Commission to conduct more research into local conditions before enacting the Ordinance. *Id.* at 3–4. Second, Mr. Greg Noble testified that he had personally reconnoitered booths in three "adult" bookstores in Dayton and found the "stench of semen" and "semen marks" everywhere within the booths, *id.* at 5, thus corroborating Major Long's testimony. Finally, Mr. Steve Koob, representing the Montgomery County chapter of the American Family Association, spoke in favor of the Ordinance's passage, noting that (in his opinion) patrons of booths in Dayton's adult businesses are no different from patrons of booths in Columbus, where (in his under-

standing) special equipment had been used by investigators to document the presence of semen in the booths. *Id.* at 6. All of the above information submitted to the City Commission, but particularly the City Law Director's report on the Columbus, Ohio, study and Major Long's testimony (as corroborated by that of Greg Noble), is such as could reasonably be believed to be relevant to the problem to be addressed by the Ordinance.

Moreover, Plaintiff's assertion, Doc. # 7 at 14, 16, that the Commission had before it no evidence of sexual activity within booths in Dayton's adult businesses is simply not accurate. The Court disagrees with Plaintiff's characterization of Major Long's testimony as only concerning sexual activity occurring *"in and around"* adult bookstores and giving rise only to a "very limited implication" regarding sexual activity within the booths. Plaintiff's Trial Memorandum, Doc. # 11, at 5. When viewed in the context of the City Law Director's remarks introducing Major Long, Transcript at 2, the latter's statement that male prostitutes have told police that they make their contacts *outside* the adult bookstore or movie theatres and "go *inside and performed* [sic] the acts *in there*" is fairly read as a reference to the booths. *Id.* at 3 (emphasis added).

As noted previously, the parties to this litigation have not objected to this Court's characterization of their stipulation as meaning that the Transcript "represents the universe of information that was *submitted* to the City Commissioners, along with the wording of the ordinance in question," *prior to the vote to enact same.* Doc. # 6 (emphasis added). The Transcript does not, however, necessarily represent the extent of the Commissioners' own awareness of the national problem of AIDS and sexually transmitted diseases in general, and about the association of anonymous sexual

---

Court's decision in this case. Nor, for that matter, is it relevant that the Law Director told the Commissioners about caselaw in other jurisdictions. The issue is whether the Commissioners could reasonably believe that the evidence before them was relevant to the problem they were trying to address. As discussed below, the Commissioners had such evidence in the Law Director's recital of the findings of the Columbus, Ohio, study and in Major Long's testimony as corroborated by that of Greg Noble and, to a lesser extent, that of Steve Koob.

activity in adult businesses with the spread of AIDS in particular. Legislative notice of such matters may be deemed to extend as widely as does judicial notice thereof. *Wall Distributors, Inc. v. City of Newport News*, 782 F.2d 1165, 1169 n. 7 (4th Cir. 1986).

There is no longer the need, as there arguably was less than a decade ago, for expert testimony as to the correlation between the sexual activity occurring in situations targeted by the Dayton Ordinance and the spread of sexually transmitted diseases, particularly AIDS. That such a correlation exists is no longer open to doubt and is a matter of common knowledge. It is entirely proper (as did the Court in *Wall Distributors*, a pre-*Renton* case, in approving a city's reliance upon other cities' experiences) to evaluate the strength of the

City's interest "not solely on the basis ... of what had already demonstrably occurred within [a city's] geographical borders, but of what [the City] might reasonably foresee in light of a sufficiently documented wider national experience properly reflected in matters of public record." *Id.* (applying *United States v. O'Brien*'s "substantial government interest" prong and upholding "open booth" provision of ordinance). Finally, it must be noted that courts ruling upon the constitutionality of "open booth" ordinances have repeatedly held "substantial" a city's interest in curtailing conduct constituting a threat to public health because it facilitates the spread of AIDS and/or other sexually transmitted diseases. *See, e.g., Broadway Books, Inc.*, 642 F.Supp. at 491; *Movie & Video World*, 723 F.Supp. at 699; *Wall Distributors*, 782 F.2d at 1169.[9]

---

9. In an apparently *ex parte* letter to the Court of January 22, 1990 (Doc. # 16), Plaintiff's counsel argues that language in the Supreme Court's recent decision in *FW/PBS, Inc. v. City of Dallas*, — U.S. —, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), supports Plaintiff's contention that the Dayton ordinance is unconstitutional because it lacks factual underpinnings. In *FW/PBS,* motel owners renting rooms for fewer than 10 hours argued that their inclusion within the ambit of a Dallas, Texas, ordinance passed in 1986 and regulating "sexually oriented businesses" violated the due process clause because the City had insufficient factual support for its determination that the rental of motel rooms for fewer than 10 hours leads to crime and prostitution. 110 S.Ct. at 610. The owners argued that a 1977 study by the City of Los Angeles cursorily reviewing the effect of adult motels on their neighborhoods was the only factual support for the City's determination. *Id.* Justice O'Connor wrote:

> The Court of Appeals thought it reasonable to believe that shorter rental time periods indicate that the motels foster prostitution and that this type of criminal activity is what the ordinance seeks to suppress. See 837 F.2d [1298] at 1304. [ (5th Cir.1988) ]. Therefore, no more extensive studies were required than those already available. We agree with the Court of Appeals that the reasonableness of the legislative judgment, combined with the Los Angeles study, is adequate to support the City's determination that motels permitting room rentals for less than 10 hours should be included within the licensing scheme.

*Id* (*FW/PBS* struck down the licensing provisions of the Dallas ordinance under *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)).

Plaintiff argues 1) that this language amounts to a *mandate* "that the reasonableness of [the legislative] judgment be *combined* with underlying support, [in *FW/PBS* ], a study by the City of Los Angeles that was reviewed and considered by [Dallas]" (Doc. # 16 at 2); and 2) that *FW/PBS* dictates that the "stipulated vacuum" in which the Dayton ordinance was passed renders said ordinance constitutionally infirm. *Id.* The Court does not read Justice O'Connor's language as in any way overruling, or even modifying, the *Renton* "substantial government interest standard" (as Plaintiff apparently argues) or as mandating more factual support than the City of Dayton had before it in the instant case.

More importantly, the Plaintiff has misconstrued the nature of the parties' stipulation regarding the Transcript of the second reading of Dayton's Ordinance. As characterized by this Court (a characterization not objected to by Plaintiff), said stipulation means merely that the Transcript comprises all the information submitted to the City Commission, along with the wording of the Ordinance, before passage of same. Doc. # 6. The Transcript shows that the City Commissioners were told the results of a study of booths in adult businesses in Columbus, Ohio, and that they heard testimony concerning sexual activity within booths in adult businesses in Dayton. Moreover, the Transcript does *not* represent all that the City Commissioners knew regarding the widely accepted and understood connection between the sexual activity the Dayton Ordinance targets and the spread of diseases such as AIDS. *See* this Court's discussion of legislative notice, *supra* n. 9 and text at 17–18. There is, therefore, "adequate," *FW/PBS*, 110 S.Ct. at 610, support for the City's determination that high-risk sexual activity occurs in viewing booths in adult businesses and

### 3. Narrowness

(requirement that the ordinance be *designed to serve* a substantial government interest)

*Renton* requires that a valid time, place and manner regulation be "designed to serve" a substantial government interest. 475 U.S. at 50, 106 S.Ct. at 930. The *Renton* Court mentioned that the ordinance before it had been "narrowly tailored," *id.*, but did not elaborate upon the precise test to be applied to its "narrowness requirement." The Supreme Court has recently clarified the appropriate standard in *Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 *reh'g den.,* —— U.S. ——, 110 S.Ct. 23, 106 L.Ed.2d 636 (1989). A least-restrictive means analysis is not required. Rather, under *Ward,* "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." 109 S.Ct. at 2758.

Plaintiff argues that the Ordinance fails to satisfy the *Ward* standard, because merely removing the bottom two feet from the doors of the viewing booths would "clearly fulfill" the City's purpose of precluding illicit sexual activity in the booths. Doc. # 7 at 12. That idea would deal with the no-more-than one-person-per-booth problem; however, since masturbation is one of the types of illicit sexual activity which the Ordinance expressly targets, *see* Preamble to Ordinance, Appendix A, the requirement that the booth doors be removed entirely is not "broader than necessary", *Ward,* 109 S.Ct. at 2758, to achieve that aspect of the City's interest.

### 4. Alternative channels of communication

Finally, *Renton* requires that a time, place and manner regulation, allow for "reasonable alternative avenues of communication." 475 U.S. at 50, 106 S.Ct. at 930. The Court finds that this requirement is easily satisfied by the Dayton Ordinance, which neither limits the number of viewing booths in which sexually explicit materials may be viewed, nor purports in any way to ban the viewing of such materials either in the booths or elsewhere. In short, not only are reasonable alternative channels of communication allowed for, but the option of viewing such materials in booths also remains available under the Ordinance, thereby complying with *Renton. Movie & Video World,* 723 F.Supp. at 701.

The Ordinance is a valid time, place and manner restriction which is a) supported by a substantial government interest, b) is not substantially broader than necessary to effectuate that interest, and c) allows for ample alternative means of expressing protected speech. The Court therefore holds that Defendants are entitled to judgment as a matter of law on Plaintiff's first amendment claim.[10]

that removing the doors of said booths will discourage such activity and its attendant transmission of disease.

**10.** Plaintiff alleges that the Ordinance will have a *chilling effect on the exercise of Plaintiff's* right to disseminate the films and/or live entertainment offered at its place of business because: it discourages customers who wish to pay to view materials in private from patronizing Plaintiff's booths; it discourages patronage by customers who choose to pay for use of the booths despite the lack of doors because they will be subject to invasions of their privacy both by the "mandatory observation" of their activities which the Ordinance calls for and by other customers who will attempt to view movies for which they have not paid; it discourages patronage because it subjects customers to the discom-

fort and embarrassment attendant upon being constantly monitored while viewing sexually explicit material. Doc. # 1 at ¶ 24.

Furthermore, Plaintiff argues, its patrons' exercise of their rights will be chilled because the Ordinance subjects them to possible sexual harassment and sexual advances by other customers who would otherwise be excluded by the presence of a door, and because the Ordinance impairs patrons' ability to hear the materials they are viewing due to noise from adjacent booths. *Id.*

Giving the Plaintiff the benefit of every inference from these conclusory statements in its verified Complaint, the Court nevertheless finds that the evidence establishing that Plaintiff's business will suffer, or that potential patrons will cease to frequent Plaintiff's viewing booths, as a result of the Ordinance, *if* such evidence

## B. *Privacy Right Claim*

■ At several places in the Complaint, Plaintiff asserts that the Ordinance violates the rights of its patrons to view constitutionally protected material in private. *See, e.g.,* Doc. # 1 at ¶¶ 23–25, 30. Plaintiff argues that its viewing booths, as currently constructed, are "private places" in which Plaintiff's patrons' "privacy right" is to be protected. *Id.* at ¶ 28. The origin of this right to privacy within the booths is, according to the Complaint, grounded both in the United States Constitution and in federal law. *Id.* at ¶ 30.

It is unclear whether Plaintiff has standing to assert his patrons' privacy rights. The Court is willing to assume such standing, *arguendo*, in order to reach the merits of Plaintiff's privacy claim; however, the Court has found, and Plaintiff has cited, no caselaw supporting Plaintiff's proposition that its patrons have an inherent right to view sexually explicit, non-obscene material in the privacy of an enclosed video booth located in a public business establishment.[11] Plaintiff's assertion to the contrary notwithstanding, Trial Memorandum at 28 n. 12, neither the Supreme Court's decision in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (holding that the viewing of obscene materials in one's home is constitutionally protected), nor its decision in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (holding that there is no privacy right to view obscene movies in places of public accommodation), supports Plaintiff's proposition. It is insufficient simply to distinguish these decisions on the ground that they involve the right to view *obscene* materials. Indeed, the broader language of *Paris Adult Theatre*, distinguishing *Stanley*, is most persuasive and relevant herein:

> [I]t is unavailing to compare a theater, open to the public for a fee, with the private home of [*Stanley*].... This Court has, on numerous occasions, refused to hold that commercial ventures such as a motion-picture house are "private" for the purpose of civil rights litigation and civil rights statutes.

413 U.S. at 65, 93 S.Ct. at 2639 (citations omitted). Given this language, and the fact that the right of privacy has not been extended to public businesses, the Court declines to broaden that right to include a right to view non-obscene movies or live entertainment in an enclosed booth in Plaintiff's place of business. *Accord Doe v. City of Minneapolis*, 693 F.Supp. 774, 782–83 (D.Minn.1988) (upholding ordinance requiring removal of booth doors in adult bookstores despite challenge based, inter alia, upon a claimed violation of privacy rights).[12] Therefore, as a matter of law, Plaintiff's privacy right claim must fail.

The Court next addresses three claims asserted in the Complaint but not pressed

---

exists at all, is clearly insufficient to create a genuine issue of material fact as to this aspect of Plaintiff's first amendment claims.

11. Plaintiff also relies upon *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), for the proposition that its patrons have a reasonable expectation of privacy in its viewing booths. Plaintiff's Trial Memorandum at 27. *See also* Doc. # 1 at ¶ 28. The Court would point out that to the very limited extent that Plaintiff's argument encompasses an assertion of the fourth amendment rights of its patrons, *see, e.g.,* Plaintiff has no standing to assert same. "Fourth amendment rights are personal rights ... which may not be asserted vicariously." *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969); *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980).

12. Plaintiff also urges the Court to find support for its patrons' claimed right in the context of a "background of ever increasing federal statutory protection of privacy rights of those exercising [first amendment rights]." Trial Memorandum at 30. Plaintiff points to the provision of the Federal Privacy Act which prohibits government agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to ... authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). This statute effectuates a federal interest in protecting individuals from potential abuses of governmental information-gathering and surveillance. The Court fails to see, however, and Plaintiff cites no caselaw so suggesting, that this statute supports a claimed right of Plaintiff's patrons to view sexually explicit, non-obscene material in an enclosed viewing booth.

upon the Court either in Plaintiff's Response (Doc. # 7) to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. # 5), or at oral argument.

## C. *Equal Protection Claim*

 Plaintiff asserts that the Ordinance violates its rights under the Equal Protection Clause of the fourteenth amendment in that the Ordinance arbitrarily exempts "the same type of conduct" by other establishments (in particular the University of Dayton) that have video booths on the premises. Doc. # 1 at ¶ 32. Defendants respond, by way of memorandum in support of their Motion to Dismiss or, in the Alternative, for Summary Judgment, that the City of Dayton has "no evidence ... showing [that] activities at such other booths produce the kind of 'secondary effects' which occur in booths exhibiting adult films," and that, therefore, Plaintiff's Equal Protection Claim is without merit. Doc. # 5, at p. 6. Neither party cites law in support of its contention. Taking as true the allegations, set forth in Plaintiff's verified complaint, of disparate treatment under the Ordinance based upon the type of "establishment" (the Defendants' statements set forth in their Memorandum are not proper Rule 56 materials to consider in ruling on a motion for summary judgment), summary judgment must nevertheless be granted in favor of the Defendants on Plaintiff's Equal Protection claim.

As previously discussed, the films and entertainment exhibited and offered for sale or rental by Plaintiff are not classified as legally obscene. They are, therefore, protected by the first amendment from *total* suppression. *Young v. American Mini Theatres*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976). Nevertheless, the City of Dayton may, consistent with the fourteenth amendment's Equal Protection Clause, use the content of the sexually-explicit, non-obscene materials exhibited or offered for sale by "adult" businesses/theatres (such as Plaintiff's) as the basis for classifying and/or regulating them in a manner different from other places of businesses/theatres, as long as the classifica-

tion is justified by an important government interest. *Id.* at 63–73, 96 S.Ct. at 2448–54. Given this Court's previous discussion of the nature of the City of Dayton's interest in enacting the Ordinance at issue herein, Plaintiff cannot, as a matter of law, prevail on its Equal Protection claim. *Accord Renton,* 475 U.S. at 55 n. 4, 106 S.Ct. at 933 n. 4 (citing *American Mini Theatres,* 427 U.S. at 63–73).

## D. *Federal Preemption Claim*

 Plaintiff also alleges that the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710, preempts the Ordinance at issue in this case. Doc. # 1 at ¶ 27. Plaintiff asserts that enforcement of the Ordinance will force the public disclosure of its patrons' "purchase, rental or viewing" of videotaped materials and that such disclosure violates privacy rights inherent in this Act. *Id.* at ¶¶ 25–26. Plaintiff misconstrues the nature of the disclosure which the Act regulates. As its legislative history makes clear, the Act was intended to prohibit, except in limited circumstances, the disclosure to public or private entities of *records* (or information derived from those records) kept by video tape service providers and linking the names of customers with the subject matter of the videotaped materials they have rented or purchased. Senate Report No. 100–599, 100th Cong., 2d Sess., *reprinted in* 1988 U.S. Code Cong. & Admin. News 4342–1, 4342–1-4342–9.

Although Plaintiff is correct in noting the privacy concerns "inherent" in the Act, Doc. # 1 at ¶ 26, nothing in its legislative history or its language suggests that it protects against the possibility that a patron's choice of viewing material might be "disclosed" to others by virtue of the removal of the door of a video booth. Moreover, as Defendants rightly point out, the Ordinance does not require that amusement arcades disclose to anyone their patrons' choices of videotaped subject matter. Doc. # 5 at 8. The federal Act, in terms, preempts only those provisions of local law that require the disclosure prohibited by the Act. 18 U.S.C. § 2710(f) (1988).

Therefore, the Court deems well-taken, and hereby sustains, Defendants' Motion for Summary Judgment on Plaintiff's federal preemption claim.

### E. *Procedural Due Process Claim*

Finally, Plaintiff alleges that Defendants violated its right to procedural due process in that they "failed and refused" to provide Plaintiff any empirical or factual evidence supporting the Ordinance, and failed to allow Plaintiff an adequate opportunity to be heard, before voting to enact the Ordinance. Doc. # 1 at ¶ 33. Plaintiff cites no law, and the Court knows of none, indicating the source of such a right. The Court would note that Plaintiff's counsel *was* given the opportunity to speak at the October 19, 1989 Dayton City Commission meeting, *was* present to hear the factual information placed before the Commission as a basis for the Ordinance, and indeed argued against passage of same. Defendants' Motion for Summary Judgment on Plaintiff's procedural due process claim is therefore sustained.

In accordance with the foregoing analysis, the Court hereby sustains Defendants Motion (Doc. # 5), considered as a Motion for Summary Judgment, and grants summary judgment for the Defendants and against the Plaintiff.

### F. *Effective Date of Ordinance*

By virtue of this Court's sustaining of the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, treated as a Motion for Summary Judgment, this Court has in effect declared the Ordinance constitutionally and legally valid in all respects.

The Ordinance was originally set to go into full force and effect on Tuesday, January 16, 1990. On that date, this Court, *sua sponte*, issued a Temporary Restraining Order, enjoining the enforcement of the Ordinance by the City of Dayton until January 25, 1990, or the announcement of its decision and reasoning in support thereof, whichever event occurred first. (Doc. # 13).

In order to allow the Plaintiff to take the necessary steps to comply with the Ordinance in question, it is the request of this Court that the Defendants not enforce said Ordinance for a period of 24 hours after the filing of this decision.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

### INDEX TO APPENDICES

Appendix A Ordinance # 28028 (attached)

Appendix B Verified Copy of Transcript
Second reading of Ordinance # 28028
October 18, 1989

### APPENDIX A

### EXHIBIT A

By . . . . . . . . . . . . . . . . . . . . . . . .

No . . . . . . . . . . . . . . . . . . . . . . . .

### AN ORDINANCE

To Supplement the Revised Code of General Ordinances By Enacting Sections 136.08 and 136.09 Thereof.

WHEREAS, adult oriented establishments install booths with doors in which patrons can view adult oriented movies or videotape or film or view other forms of adult entertainment; and

WHEREAS, the closed peep show booths in adult bookstores provide a haven for carnal sexual activity; and

WHEREAS, it is well known and has been found in Milwaukee and Kenosha Counties, Wisconsin; Chattanooga, Tennessee; Newport News, Virginia; Marion County, Indiana; Dallas, Texas; Minneapolis, Minnesota; Phoenix, Arizona; Delafield, Wisconsin; and Columbus, Ohio, to name but a few localities, that viewing booths in adult oriented establishments have been or are being used by patrons of said establishments for engaging in sexual acts, particularly between males, including, but not limited to intercourse, sodomy, or oral copulation and masturbation, resulting

in unsafe and unsanitary conditions in said booths; and

WHEREAS, carnal sexual activity contributes to the epidemic spread of sexually transmitted diseases, including AIDS, presenting a threat to the public health and welfare; and

WHEREAS, the Attorney General's Commission on Pornography recommends that local governments ban certain features of these booths that facilitate carnal sexual encounters; and

WHEREAS, ordinances such as or similar to the instant have been held to be constitutional for the reasons stated therein in all of the jurisdictions recited above; now, therefore,

BE IT ORDAINED BY THE COMMISSION OF THE CITY OF DAYTON:

Section 1. That the Revised Code of General Ordinances, be and it is hereby supplemented by the enactment of Sections 136.08 and 136.09 which shall read as follows:

§ 136.08 DEFINITIONS

(A) "Amusement Arcade" means any place of business in which a film or video viewing service or devices are located for the use of entertainment of a person or persons patronizing the place of business, but does not include hotels and motels.

(B) "Film or video viewing device" means any electrical or mechanical device which projects or displays any film or videotape or reproduction, the temporary use of which is contingent upon the payment of some consideration and which use is to occur upon the premises where the device is located.

§ 136.09 FILM OR VIDEO VIEWING DEVICE SPECIFICATIONS AND REQUIREMENTS

(A) Any amusement arcade containing film or video viewing devices shall comply with the requirements of subsection (B) herein if the material exhibited by the devices depicts any of the following elements:

(1) Vaginal or anal intercourse between persons, regardless of sex;

(2) Sexual contact between humans and animals;

(3) Masturbation, whether of another or one's self;

(4) Oral sex, real or simulated;

(5) Graphic depiction of human excretory functions;

(B) Each and every viewing booth for all film or video devices must comply with all of the following:

(1) Be visible from a well-illuminated continuous main aisle;

(2) Not be obscured by any curtain, door or other enclosure;

(3) All side or rear walls must be without holes or openings;

(4) Shall not be occupied by more than one patron at a time;

(5) Be illuminated by a light bulb of a wattage of no less than 25 watts.

(C) No owner, operator, employee, or agent of an amusement arcade shall violate this section and/or allow and/or permit a violation thereof to occur.

(D) No patron of an amusement arcade shall violate subsection (B)(4) above.

(E) Whoever violates this Section is guilty of a misdemeanor of the first degree.

§ 136.10 EFFECTIVE DATE

(A) This ordinance shall become effective ninety (90) days from the date of its enactment.

Passed by the Commission........, 1989

Signed by the Mayor............, 1989

_____

MAYOR OF THE CITY
OF DAYTON, OHIO

Attest:

_____

Clerk of the Commission

Approved as to form:

[Signature]
City Attorney

## APPENDIX B

MAYOR:

Mr. Sawyer would you come up please. I'd like you to set the tone for this discussion.

MR. SAWYER:

Set the tone, I'd be delighted to set the tone. Your honor, Commissioners and Manager, as you know several jurisdictions including municipalities, have enacted ordinances regulating certain items in establishments that have so called "peep shows". Most of these, of these ordinances have at the central core one major requirement or a variation thereof and that requirement is that the booths not have any doors or curtains or be obscured by any such enclosure. In addition, these ordinances also require that the walls of the booths be in such a condition that there are no holes or apertures in between. The rationale for this is found in several cases which I have provided for you. All of these are Federal cases. The latest case is *Williams v. Columbus* which was—in which the ordinance of the City of Columbus was upheld by the United States District Court in Columbus as well as the Sixth Circuit Court of Appeals. Those two cases have been provided for you. In addition to that there are several other cases which are provided and just for the record, they are *EllWest Stereo Theatres v. Wenner, Wall Distributor v. City of Newport News Virginia, Broadway Books v. Roberts, Dumas v. City of Dallas, Berg v. Health and Hospital Corporation of Marion County, Fort Worth PBS, Inc. v. Dallas, John Doe v. City of Minneapolis, Williams v. Columbus,* and in addition to that a recent case which was graciously provided to me of late and that's the *Seattle Acorn Case v. City of Seattle.* In all of these cases the courts consistently one and all have ruled that these ordinances are not ordinances that regulate First Amendment protected activity they are simply content neutral in that a municipality or a enabling jurisdiction has the right to enact ordinances which prohibit the placement of doors or curtains in the—in the booths. In addition to that they also require, not all, but

some do, and the ones that did, they were held constitutional. The lighting of hallways from which activity in those booths can be observed by either management, the public and/or members of law enforcement. Why so? It has been determined in several of these cases and I can tell you that you can take judicial notice of what has happened in these cases in Columbus and other municipalities and enabling jurisdictions as to what happened in those cities. You need not make those factual finding within this jurisdiction. You don't need the factory to burn down in Dayton because and wait for that because if the factory burns down elsewhere then you know it could likewise happen here. The Court does not require that you have the same problem factually and make such findings when you can borrow and adopt those findings from elsewhere. So that you can rely upon the findings found in these cases as in City of Columbus and as in every other case that I provided to you. The problem is that other jurisdictions including Columbus there has been finding or there has been findings or those have been findings that certain types of sexual activity occur within those booths when they are obscured either by doors or curtains or the hallways are not lit up appropriately and that activity occurs not only within the booths, occurs between the booths when the partitions are not have been compromised.

COMMISSIONER CAPIZZI:

Mr. Sawyer, I want to interrupt for a second because I want to make a point there. The legislation specifically does not restrict an individual's right to go into those "peep shows" and watch the shows. What the legislation is doing is really a health and safety issue and says that we have not restricted you from doing what you want to do but if you want to do it, have the light on or have the curtain, no curtain or no door. Isn't that basically correct?

MR. SAWYER:

That is correct and the rationale here is that this ordinance is content neutral. What you are regulating or deregulating

is not First Amendment protected activity such as the nature of the film that is being watched or the performance that is being watched. What you are regulating is content neutral that does not deal with what is being observed by the patron but doing it because there is a health, safety and welfare factor which is the spread of communicable diseases, of venereal diseases and AIDS and that finding has been made in other jurisdictions including Columbus in the cases that I have provided to you. Basically, that would be the rationale for the enactment of this ordinance.

**MAYOR:**

Is there any other question or comments you have of Mr. Sawyer? I guess it would be safe to say that dealing with the health, safety and welfare of this community that there's been evidence in other cities that sexual activities have been occurring behind those closed doors. What we're doing is removing those closed doors to prevent those type of activities from going on in our city, thus insuring the health and safety of our community.

**MR. SAWYER:**

In addition, your honor, Major Long from the Department of Police is here and he will tell you that male prostitutes have related to members of his department that they have taken other customers into these establishments for sexual activity to occur within the booths and I'd like to have Major Long come up and make that brief statement, if I may.

**MAJOR LONG:**

Your honor, members of Commission, several of our officers who have been assigned to some of the areas especially when we talk about the bookstores and some of the theatres around town have answered many complaints from citizens about the homosexual activity or prostitution activity in these areas and we have made contact with these people and a lot of them have indicated to us that they do indeed make a lot of their contacts outside of the bookstores or movie theatres and go inside and performed the acts in there. We've even conducted certain trick operations like a decoy operation where people have approached our officers for the same type of activity and I think that its safe to say that we have had many complaints in there and some of those complaints we've found to be valid.

**MAYOR:**

All right, thank you.

**MR SAWYER:**

Finally, one last comment. In Columbus there was a finding by the Mayor's Commission and by the Commission itself, that particles of semen have been found on walls of these booths and that per se obviously presents a health risk. Thank you.

**MAYOR:**

Thank you. Any other comments by my colleagues or there anyone in attendance who have expressed a desire to speak on this item.

**DON CRAWFORD:**

Yes, there are your honor. One being, Mr. Lee Klein.

**COMMISSIONER CAPIZZI:**

Mr. Crawford there are number of people here tonight who have never been to a Commission meeting before. Can you give them the ground rules on how we proceed from this point forward?

**DON CRAWFORD:**

Yes, I thank you Commissioner. It's simply that anyone who wishes to speak on an item, such as this one that's on the calendar and did not sign a slip indicating that, should make that known to us otherwise you would be after the fact, as it were, with your comments later and the ground rules are that five minutes is the maximum for comments on any item now or later.

**LEE KLEIN:**

May I proceed?

**MAYOR:**

Yes sir.

**LEE KLEIN:**

Mayor, Commissioners, my name is Lee Klein, I'm an attorney. I am here on behalf of the McCook Theatre. Five min-

utes, I'm not going to be able to persuade you that what Mr. Sawyer said is wrong. I have been practicing First Amendment law doing Constitutional law and these type of ordinances for over ten years now. He cites to you a number of cases which I suggest to you, do not stand for the propositions which he has asserted. A number of those ordinances were upheld on various other issues unrelated to what you are have in front of you this evening and what you are going to be considering and I urge you that a basic of premise of Constitutional law before you're going to affect somebody's First Amendment rights, is to determine that the rationale underlying it is legitimate and exists before you pass something. It is my position and on behalf of my client, that no such criminal activity or sexual conduct that you're alluding to here has existed in any of the adult establishments for the last ten years. I've had discussions with my client, I have sent each of you a letter, which you're aware of, and we've asked for records of the Police Department to verify this fact to you and I urge you not to pass an ordinance until you've had an opportunity to look at those records. If there in fact was such activity, why didn't the Police Department come to you and say "here's the records of the arrests". If they did an undercover operation and said there was illicit activity going on in the booths, why don't they come here and show you the records showing here's the arrests that we've made and where we've made them. You are going to affect very detrimentally the First Amendment rights not only of my client but of all the adult establishments here in Dayton and I am suggesting to you that to do so based on a simple premise that you are quote "relying on other city's findings" when in fact those circumstances do not occur and are not occurring here in the City of Dayton is unconstitutional and improper. I am glad that at least Mr. Sawyer pointed out to you that I sent him a copy of *Acorn Investments*. He cites that to you and says that this stands for a proposition that helps him. Mr. Capizzi, you're an attorney, read the case. It says if you have no factual foundation to support such a position, it is unconstitutional to affect my client's First Amendment rights. Please read it. My client doesn't want to be in Federal Court arguing this. If we're in Federal Court, and I'm right and you're wrong, the City's going to pay my legal fees. If on the other hand, however, you do the smart and intelligent thing and get the records first to prove whether in fact the premise for this ordinance is appropriate then you can pass it and you don't have any concerns. You've gone all these years without an ordinance saying take the doors off of there. Now you're going to rush to pass one and risk the taxpayers dollars that they're going to end up paying my fees if you're wrong. When all you need to do, is find out in advance whether in fact the premise for this ordinance is legitimate. I am suggesting to you that it is not legitimate. If I'm wrong, prove me wrong or give me the opportunity to prove that your premise is wrong. I have asked for records demonstrating this, I have no problem in terms of organizing that, getting the records from the Police Department or any other department to justify that in fact the supposed conduct that's occurring does not occur. My client, the McCook Theatre, has been there operating as an adult establishment since 1979. In all those years, it's had not one incident of any allegations of improper illegal sexual activities or any other illegal activity of any kind or nature occurring on the premises. Yet now what you want to do is pass an ordinance that jumps in and says "well the private citizen who wants to come in there and in the privacy of a room watch an adult film so that nobody else can come by on the outside and see who he is or what his selection of viewing material is. You want to take that away from him. You want to take away my client's right to have that type of material available to him to view without having other people watch him view it and I suggest to you

that there is a very intrical right that every individual citizen has and before you take it away from them, please do your homework and make sure that you have a legitimate overriding governmental interest that gives you the right to do that and don't do it on such short notice and without finding out what the facts are. That is what I have to say, I'd be glad to respond to any questions that any of you might have.

MAYOR:

Any questions? Thank you very much and Mr. Obie Nicholini?

DON CRAWFORD:

One just handed to me says "peep show, Greg Noble".

GREG NOBLE:

Your honor, fellow Commissioners. I'd like to briefly address this very issue and ... I think one of the basic problems that we're looking at is the confusion over this whole issue and what I want to stress to you is that while pornographers may stress that this is indeed a First Amendment right which involves free speech, I would like to pose to you that it's far from it. What the previous speaker wants to do is more than protect the right of certain folks to see a film like this in the privacy of a booth. What he's doing is advocating anonymous sexual activity within these booths. Recently, I had an interest in this and decided to check one of these out for myself. Being what I would consider of average background not having a propensity to visit these places, I had no idea what they were like. So this last weekend I went to three of the adult bookstores within the City of Dayton and I can say to you that each of those three, number one, had a stench of semen and urine and other matters. Number two, when you go into the booths themselves they are very dim in lighting, you can't see where you're going, bump into things. Again, the stench of semen is everywhere. If you look on the screens, the walls, there is semen marks everywhere. It's obvious what these are for, they are not there to watch these films and exercise your First Amendment rights. They are to conduct illegal sexual activity. I saw one of the places that had the actual holes between the booths, "the glory hole", they are referred to and they are of no other function then to allow another individual in the adjoining booth to engage in anonymous sexual activity, and therefore, I would highly recommend that you consider this matter very seriously. I've seen it, it's disgusting, it's not a First Amendment issue, it's an issue of having sex in a public place and I think that we need to make sure that that doesn't happen any further in our City. Thank you.

MAYOR:

Anyone else?

DON CRAWFORD:

Apparently no others on that issue Mr. Mayor.

COMMISSIONER CAPIZZI:

Excuse me Mr. Crawford, there's a gentleman who's standing.

DON CRAWFORD:

Sorry.

STEVE KOOB:

Good evening, my name is Steve Koob and I'm representing the Montgomery County Chapter of the American Family Association. This past February, I stood before you and asked the City of Dayton do something about the problems of obscenity and indecency in our City. I am very pleased to tell you tonight that I have had excellent cooperation from Rick Helwig, Tony Sawyer, Vince Popp, Jim Newby and their staffs during the past six, seven months. The viewing booth ordinance before you tonight is a very significant step forward in the battle to improve the wholesomeness of the Dayton community. Reports from Dayton and around the country confirm that "peep show" booths are commonly used for sexual activity. I don't think that the people that patron these booths in Dayton are any different than the ones that patronize them in Columbus and these other cities. These activities typically occur when more than one person occupies

the same booth, or when, as Mr. Noble said, there are holes in the walls so that people can engage in sexual activity between the booths. The patrons are sexually aroused by what they see and then they engage in sexual activities to relieve themselves. In Columbus, investigators use special equipment to document that it was actually semen on the floors, the walls and the ceilings. These conditions and activities can be very hazardous to one's health. The body fluids which are found in the "peep show" booths would be treated as biologically hazardous if they were found in a medical facility. In a hospital, someone in contact with these kinds of materials would be wearing protective clothing to minimize the risk of contracting AIDS and other diseases. Patrons entering these booths do so at the risk of exposing themselves to these diseases. By enforcing the ordinance before you tonight reduce the likelihood of the sexual activity which is extremely unhealthy in these places. I'd like to emphasize a point that Mr. Sawyer made when he said that the ordinance that was passed in Columbus was challenged in two courts. The last challenge was at the Sixth District Court of Appeals and was upheld there. The ordinance that is before you tonight is very similar to that one. That court has jurisdiction over Kentucky, Michigan, Ohio and Tennessee. I think that you are on very strong legal grounds by passing this ordinance and are at minimal risk of being challenged on constitutional grounds. I'd just like to invite those people who came here this evening in support of this ordinance to stand up and let the Commission know that we're behind you and that we very much want this ordinance passed. We see it as a step in the right direction an important step that will have some very good effects on our City. Thank you very much. Thank you City Commission.

Applause by group.

**MAYOR:**

I ask you to refrain from any demonstrations. Any other questions or comments.

**DON CRAWFORD:**

The only other that I'm aware of is Mr. Tash who would like to comment on items 29 & 31 he tells me.

**JODDY TASH:**

.... (not pertinent)

**MAYOR:**

May we have the role call please.

**DON CRAWFORD:**

Mayor Dixon

**MAYOR DIXON:**

Here

**DON CRAWFORD:**

Commissioner Henry

**COMMISSIONER HENRY:**

Here

**DON CRAWFORD:**

Commissioner Orick

**COMMISSIONER ORICK:**

Here

**DON CRAWFORD:**

Commissioner Capizzi

**COMMISSIONER CAPIZZI:**

Here

**DON CRAWFORD:**

Commissioner Zimmer

**COMMISSIONER ZIMMER:**

Here

**MAYOR:**

May we have the minute of the previous meeting please.

**DON CRAWFORD:**

On Wednesday, October 11, 1989 ... Ordinance 28028 was given first reading · · ·

....

The next would be second reading of Ordinance 28028 to supplement the Revised Code of General Ordinance by enacting Sections 136.08 and 136.09 thereof.

**COMMISSIONER CAPIZZI:**

· Excuse me, before you vote on that. I'd like to raise one point that he mentioned that I think that we've been treated unfairly only in that, we did not rush into this legislation, we could of in fact passed it as emergency legislation and I think our staff the last three, four weeks has put a lot of time and effort into

properly preparing this Commission to make the decision we're going to make, I would assume. And so I just wanted to make that point that we didn't rush into this and we have given equal opportunity for everyone and time for everyone to respond. In fact, I believe this was pretty much publicized over a month ago and since that time we've heard no comment against it until about three days ago and I think its important for the community to know that too.

DON CRAWFORD:

Role call. Mayor Dixon.

MAYOR DIXON:

Aye.

DON CRAWFORD:

Commissioner Henry

COMMISSIONER HENRY:

Aye.

DON CRAWFORD:

Orick

COMMISSIONER ORICK:

Aye.

DON CRAWFORD:

Capizzi

COMMISSIONER CAPIZZI:

Aye.

DON CRAWFORD:

Zimmer

COMMISSIONER ZIMMER:

Aye.

### AFFIDAVIT

The undersigned, being duly cautioned and sworn, hereby states the following to be true to the best of his knowledge:

1. That the undersigned is employed as Commission Clerk by the City of Dayton and as such is familiar with the proceedings of the City Commission of the City of Dayton, Ohio.

2. That the undersigned has reviewed the tape of the October 18, 1989, meeting of the Dayton City Commission and the attached transcript identified as Exhibit "A" and finds said transcript to be a complete and accurate transcription of the oral statements made at the said meeting relating to the so-called "Peep" booth ordinance (No. 28028).

/s/ Don L. Crawford
DON L. CRAWFORD

Sworn to and subscribed before me this 4th day of December, 1989.

/s/ C.J. Bartley
NOTARY PUBLIC
C.J. Bartley, Notary Public
In and for the State of Ohio
My Commission Expires
March 21, 1994