782 F.2d 1165
 WALL DISTRIBUTORS, INC., a Virginia Corporation, Appellant,
v.
The CITY OF NEWPORT NEWS, VIRGINIA, an incorporated
municipality; Joseph C. Ritchie, in his official capacity
as Mayor of Newport News, Virginia; Darrel W. Stephens, in
his official capacity as the Chief of Police for the City of
Newport News, Virginia, Appellees.
 No. 84-1905.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 7, 1985.
Decided Jan. 30, 1986.
 
 Frederic L. Moschel, Hampton, Va. (Cumming & Patrick, Arthur M. Schwartz, Hampton, Va., on brief), for appellant.
 Leonard A. Wallin, II, Asst. City Atty., Newport News, Va. (Robert V. Beale, City Atty., Newport News, Va., on brief), for appellees.
 Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 Wall Distributors, Inc. (Wall) appeals from a district court judgment rejecting a first amendment challenge to an ordinance of the City of Newport News which imposed licensing requirements upon and made criminal the operation of a movie arcade business in which Wall Distributors was engaged. We affirm.
 * The ordinance affects the operation of "movie arcades" in two ways. First, it requires that any arcade that exhibits movies in enclosed booths not visible from a continuous main aisle obtain a license from the Police Chief.[1] Second, it then proscribes, as criminal, the exhibition of movies in enclosed booths not visible from a continuous main aisle.[2]
 It therefore has the surface oddity of requiring one to obtain a license to do that which, if done, is declared a crime. That it is thus odd, however, does not solve the problem of its constitutionality as challenged, though of course the one could bear indirectly upon the other. See Griswold v. Connecticut, 381 U.S. 479, 527, 85 S.Ct. 1687, 1705, 14 L.Ed.2d 510 (1965) (Stewart, J., dissenting) (question is not artfulness or wisdom of legislation, but effect on specific rights).[3]
 
 
 1
 Wall operates in the City of Newport News a bookstore that concededly "deals in speech material of an explicit sexual nature," including the display of such material by coin-operated movies in enclosed booths. Its operation therefore subjected it to both the criminal and licensing provisions of the ordinance.
 
 
 2
 Wall attacked the licensing provision on the dual grounds that it directly violated the corporation's first amendment rights by regulating speech in a manner unjustified, vague, and lacking in procedural protections and that its disclosure requirements also violated first amendment privacy rights of its shareholders, employees and agents.[4]
 
 
 3
 Wall attacked the criminal prohibition provision on the basis that it directly impinged on first amendment rights of free speech by proscribing the exhibition of films whose content had not been adjudged to be outside first amendment protection.
 
 
 4
 Notably, the challenge did not include any due process or equal protection claims based on deprivation of property rights.
 
 
 5
 The district court granted summary judgment for the City of Newport News, finding the regulation by criminal proscription a constitutionally permissible manner restraint and the licensing requirement not violative of first amendment right in either respect charged. This appeal followed.
 
 II
 
 6
 We first address the constitutionality of the provision making it a criminal offense to exhibit films in closed booths. The City contends that this only imposes a valid restriction on the manner of speech. It is not contended of course that the films in question have been adjudged obscene. That they may be erotic, though not obscene, does not lessen the protection to which their dissemination is entitled. See Hart Book Stores, Inc. v. Edmisten, 612 F.2d 821, 825 (4th Cir.1979). There is accordingly no doubt that their dissemination is basically under first amendment protection. See Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243, 1245 (9th Cir.1982) (evaluating a comparable closed booth regulation). Nor is there any contention that the criminal provision has not even an incidental effect upon the unchallenged basic right, for failure to comply with the regulation would undeniably subject Wall to punishment for exercising in the specific way proscribed the general right to exhibit the films' contents. See id. at 1246.
 
 
 7
 But this of course does not end the inquiry. For restrictions merely on the time, place, or manner of exercise of free speech rights violate no constitutional protections if sufficiently justified and narrowly enough drawn. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, ----, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).
 
 
 8
 The regulation here is properly analyzed under the time, place, and manner tests, for the regulation does not regulate speech on the basis of content,[5] but instead, restricts primarily noncommunicative aspects of Wall's right to disseminate the content of the films and thereby imposes only an incidental burden on that right. See Ellwest, 681 F.2d at 1245-46; Hart, 612 F.2d at 828.
 
 
 9
 The question is therefore narrowly whether the incidental burden imposed by this restraint on the manner of dissemination of protected speech is nevertheless sufficiently intrusive on the basic right that it runs afoul of first amendment protections. Such a manner restriction is valid:
 
 
 10
 if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on ... First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 11
 O'Brien, 391 U.S. at 377, 88 S.Ct. at 1697.
 
 
 12
 Applying the O'Brien test, we hold first that the open booth regulation lies within the general constitutional power of the City. The regulation is designed to promote the public welfare by preventing crime and maintaining sanitary conditions in and around arcades, and therefore, falls within the broad general limits of the police power. See Ellwest, 681 F.2d at 1246; Hart, 612 F.2d at 828 & n. 8.
 
 
 13
 To meet the second element, the requirement that the regulation further an important or substantial government interest, the City advances government interests of reducing crime and maintaining public health and decency standards. The City contends that the open booth requirement is based upon a reasonable legislative determination that its enforcement will prevent masturbation with its related unsanitary conditions and other activities offensive to decency that demonstrably accompany furtive viewings of the materials.
 
 
 14
 Although Wall assails the lack of evidence of the precise nature of activities and health conditions in the booths before adoption of the open booth regulation,[6] a court in constitutional review need only conclude that the City has advanced sufficient government interests. The decision to enact such a regulation constitutes a legislative determination that closed booth showings produce side effects that are destructive of public health, decency and order. To have this determination sustained against constitutional attack, a legislature is not bound to create an evidentiary record that would pass muster on plenary judicial review of legislation's necessity and fitness to achieve desired results. Judicial review goes only to whether the legislative determination of justification and fitness is not facially without factual support, hence not arbitrary and capricious. See Hart 612 F.2d at 828 (government interest established by record showing that state legislature reasonably determined on basis of health official's report of extant conditions that "sex supermarket" zoning regulation would prevent destructive effects on neighborhoods); Ellwest, 681 F.2d at 1246-47 (government interest established by record showing legislature's reasonable foresight of deleterious consequences from continued closed booth operation based upon police reports of extant conditions).
 
 
 15
 As did the court in Ellwest, we conclude that the City here had a reasonable basis for determining that closed booth showings were sufficiently likely to foster a pattern of conduct inimical to public health, decency and order that in those interests they should be foreclosed.[7]
 
 
 16
 The third element of the O'Brien test requires that the government interest not be related to suppression of free expression. Under this element, courts must "eschew altogether the 'guesswork' of speculating about the motive of lawmakers." Hart, 612 F.2d at 829. Instead, courts must look only to the face of the regulation and the identifiable interest advanced to justify the regulation. Id. On its face and under the interests advanced by the City, the open booth regulation is designed to promote public welfare by preventing unsanitary, offensive or dangerous conditions in arcades. Although Wall protests that only "adult" movies are impacted by the regulation, clearly demonstrating that the sole motive for its adoption was that of suppressing erotic materials, so to conclude would involve precisely the type of speculation into legislative motive that we must avoid in assessing this type constitutional challenge to legislation. We therefore decline to look past the facially apparent effect of the regulation and the interest based purpose advanced for its adoption by the City.
 
 
 17
 The final factor of the O'Brien test requires that the incidental restriction on first amendment interests be no greater than is essential to achieve the interest advanced by the government. The open booth regulation appears to be the least burdensome means of controlling offensive and illegal activity within booths that can be imagined. The regulation in no way limits the time of operation, number of booths, or content of exhibitions. We conclude that the regulation is both narrowly tailored to serve the specific interest advanced by the City and that it leaves open ample channels of communication, and therefore, meets this test. See Clark, 468 U.S. at ----, 104 S.Ct. at 3069.
 
 
 18
 Having found the criminal offense provision of the ordinance to be a valid manner restraint under Supreme Court precedent, we affirm the portion of the district court's judgment upholding its constitutionality.
 
 III
 
 19
 We next turn to the City's licensing regulation. The provision requires businesses to obtain a license for exhibiting films in enclosed booths.[8] The application for the license requires substantial disclosures of background information.[9]
 
 
 20
 Licensing provisions are prior restraints on speech if they permit authorities to deny the use of a forum for protected expression in advance of actual expression. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975). The City's licensing regulation manifestly has this effect, for Wall's failure to obtain the license allows the City to prevent it from exhibiting erotic material, a form of protected expression, in the forum of enclosed booths.
 
 
 21
 However, the licensing requirement here has the bizarre aspect originally noted that, rather ironically, insures that it, like the criminal provision, is saved from the specific first amendment challenges here advanced. The licensing provision requires a license to carry on activity that is otherwise absolutely proscribed as criminal by the city ordinance. As indicated in Part II, we have concluded that plaintiff has no protectible first amendment right to make the closed booth showings that are absolutely proscribed by the ordinance's criminal provision. If the city can absolutely prohibit the activity without violating first amendment rights, it obviously may impose the lesser restrictions of a licensing requirement, so far as first amendment rights are concerned.[10] That, of course, says nothing about whether, independently of first amendment interests, the licensing requirement might implicate equal protection or due process concerns applicable to business regulations generally; but no such challenges are made here.
 
 IV
 
 22
 Concluding that both the criminal and licensing provisions of the challenged ordinance are valid restrictions only upon the manner of communicating protected speech, we affirm the district court's summary judgment upholding the ordinance against first amendment challenge.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 The ordinance provides:
 Section 5-50. Required.
 It shall be unlawful for any person to operate, or cause to be operated, a movie arcade in the city, unless such person has an unrevoked permit issued pursuant to this division.
 A movie arcade subject to the licensing requirement is defined as:
 Section 5-47. Definitions.
 * * *
 (2) "Movie Arcade". The term "movie arcade" means any business wherein is operated a "film or videotape viewing device " (emphasis added).
 A "film or videotape viewing device," which the business must operate to be considered an arcade subject to licensing, is defined as:
 (1) "Film or Videotape Viewing Device". The term "film or videotape viewing device" means any electrical or mechanical device in a business, which projects or displays any film videotape or reproduction into a viewing area obscured by a curtain, door, wall, or other enclosure which is designed for occupancy by no more than five persons, and is not visible from a continuous main aisle.
 Hence, a business is not subject to the licensing requirement unless it exhibits films in enclosed booths.
 
 
 [2]
 The ordinance absolutely prohibits, under criminal sanctions, the exhibition of films in enclosed booths by providing that:
 Section 5-55. Viewing areas.
 All viewing areas in movie arcades must be visible from a continuous main aisle and must not be obscured by any curtain, door, wall, or other enclosure.
 Section 5-48. Penalty for violation of article.
 A violation of any provision of this article shall constitute a Class 1 Misdemeanor and shall be punishable as such.
 
 
 [3]
 Inartfulness in drafting must surely be the explanation for the oddity. Contrast the City of Phoenix ordinance upheld in Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243, 1244-45 (9th Cir.1982). The challenged Phoenix licensing provision required a license to operate a "video center," and imposed as a condition for obtaining a license that there should not be closed booth showings in the "center." That ordinance therefore contemplated that a "video center" might be legitimately operated while the one here at issue defines "movie arcade" in a way that necessarily brings its operation within criminal proscription, though subject, in terms, to being licensed
 
 
 [4]
 Although only Wall, a corporate plaintiff, was before the district court, we conclude that Wall has a sufficient stake in the outcome to challenge the licensing provision's disclosure requirements relating to its stockholders, employees and agents. See Genusa v. City of Peoria, 619 F.2d 1203, 1216-17 (7th Cir.1980)
 
 
 [5]
 Wall's was the only movie arcade currently operating in the City, and Wall contends that this conclusively shows that the ordinance is in fact an ill-shrouded effort to reduce or eliminate the availability of erotic material. However, the open booth regulation in no sense purports to ban or even limit the number of forums for the public exhibition of erotic films. Erotic films continue to be fully available for public consumption, albeit not in enclosed booths. So long as protected materials continue to be fully available, and public access is not substantially impaired, regulation of time, place, and manner does not violate the first amendment. Hart, 612 F.2d at 827
 Concededly, the open booth requirement may lower public usage of arcades generating less revenue for arcade owners, and consequently, cause lower financial incentives for opening arcades, ultimately reducing the availability of erotic materials. Nevertheless, the record before us indicates that the only arcade in business before the ordinance was adopted is still in business and is complying with the open booth regulation. No evidence of reduced availability exists, and we decline to speculate as to what may be the long-term economic effect on arcade owners. See Id.
 
 
 [6]
 Record evidence that masturbation occurred in the booths prior to the regulation exists in the form of an affidavit from a public official noting the discovery of a semen-like substance. The record also notes an arrest that occurred at a now-defunct arcade, but does not contain evidence that illegal sexual activity occurred in enclosed booths prior to the regulation
 
 
 [7]
 In assessing the reasonableness of local legislative determinations of ends and means under this quite deferential standard of constitutional review, we may not confine the local legislature to only what it knows and can foresee from purely local conditions already experienced. Legislatures can no more be held bound not to know what the whole world knows than can courts; legislative notice of facts must be deemed to run at least as wide as does judicial notice
 In enacting local legislation of this sort, it therefore cannot be thought unreasonable (at least for constitutional review purposes) for local legislative bodies to assume that human nature--at least in respect of such basic matters as human sexuality and its commercial exploitation--will not vary greatly between generally comparable metropolitan areas within even so heterogeneous a society as that of twentieth century America. We therefore assess the reasonableness of Newport News' determination not solely on the basis--concededly sparse--of what had already demonstrably occurred within its geographical borders, but of what it might reasonably foresee in light of a sufficiently documented wider national experience properly reflected in matters of public record. It would defy common sense to suppose that the city fathers of Newport News are not made aware in this day and time of comparable conditions in other localities, and of the varied responses being made by other local governments to conditions already experienced. We therefore assume that a proper factor in this local legislative determination of governmental interests was what was demonstrably being generally experienced in comparable localities in, e.g., Arizona, see Ellwest, 681 F.2d 1243, and North Carolina, see Hart, 612 F.2d 821.
 To insist that governmental interests justifying such legislation could only be found in specific local experiences and conditions would be unrealistically to require deliberate subjection to those experiences and conditions before attempting to avoid them.
 
 
 [8]
 See supra notes 1 & 3
 
 
 [9]
 The disclosure requirement provides:
 Section 5-51. Filing and contents of application.
 Any person desiring to obtain a permit for the operation of a movie arcade in the city shall make written application therefor to the Chief of Police, which shall approve or disapprove such application. Such application shall contain the following information about the applicant, any person financially interested in the business to be licensed, any authorized local agents, and any managing employee of the business to be licensed:
 (1) Full legal name and any name by which the person is or has been known.
 (2) Date and place of birth.
 (3) Driver's license if available.
 (4) Fingerprints.
 (5) A current photograph.
 (6) Any prior felony or misdemeanor conviction except minor traffic violations.
 (7) Home and business address and telephone number.
 (8) Any revocation or suspension of a license issued pursuant to this Chapter.
 (9) The names of any local authorized agent who will be managing or operating the amusement at the indicated location and proof of their authority to act on behalf of the corporation.
 (10) When an agent or other authorized representative is making application on behalf of any prospective licensee, the name, address, and telephone number of a local agent authorized to conduct daily business shall be required in addition to authority to act on behalf of the prospective licensee.
 (11) An applicant from out of state shall be required to provide the name of a statutory agent.
 (12) Except for corporations listed on the major stock exchanges, the names and addresses of all persons financially interested in the business.
 (13) Such information requested by the Chief of Police to determine the truth of the information required to be set forth in the application as set forth above.
 (14) Any change in the information required to be provided above concerning the local authorized agent or the applicant shall be reported to the Chief of Police within 10 days of the change. All other information must be updated at the time of the renewal of the license.
 (15) All persons regulated pursuant to this Chapter must comply with this Section within 30 days of the effective date of the ordinance.
 
 
 [10]
 Put technically, this result follows from the fact that licensing and comparable regulatory devices that are challenged as violative of first amendment rights may be justified as merely incidental restrictions on time, place or manner under the same test applied in challenges to absolute proscriptions of speech. See Young v. American Mini Theatres, Inc., 427 U.S. 50, 63 & n. 18, 96 S.Ct. 2440, 2448 & n. 18, 49 L.Ed.2d 310 (1976)
 Wall's first amendment challenge to the licensing provisions is actually made on several grounds: that its disclosure provisions are not permissible because speech rights may not be restrained on the basis of past moral or criminal transgressions, see Near v. Minnesota, 283 U.S. 697, 720, 51 S.Ct. 625, 632, 75 L.Ed. 1357 (1931); Genusa v. City of Peoria, 619 F.2d 1203, 1218-19 & n. 40 (7th Cir.1980); that it does not provide the procedural protections required for imposing prior restraints on protected speech, see Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 559-60, 95 S.Ct. 1239, 1246-47, 43 L.Ed.2d 448 (1975); Freedman v. Maryland, 380 U.S. 51, 58-60, 85 S.Ct. 734, 738-39, 13 L.Ed.2d 649 (1965); that its disclosure requirements violate privacy rights of Wall's officers, employees and shareholders by chilling their exercise of protected speech rights, see Buckley v. Valeo, 424 U.S. 1, 65, 66, 96 S.Ct. 612, 656, 657, 46 L.Ed.2d 659 (1976); and, apparently, that its facial "vagueness" when considered in conjunction with the criminal provision, has an impermissibly chilling effect on protected speech rights, see Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964).
 As indicated, each of these grounds of challenge is based upon the premise of a protected speech right to make closed-booth showings of the materials in issue, a premise that we have concluded is unfounded in application of the time, place and manner test.