802 F.Supp. 1112 (1992)
Francis R. MITCHELL and Bob's Discount Adult Books, Inc., a corporation of the State of Delaware, Plaintiffs,
v.
COMMISSIONERS OF the COMMISSION ON ADULT ENTERTAINMENT ESTABLISHMENTS OF THE STATE OF DELAWARE, an entity within the State of Delaware, Department of Administrative Services, Division of Business and Occupational Regulation, in their official capacities, and Charles M. Oberly, III, in his official capacity as Attorney General of the State of Delaware, and Secretary, Delaware, Department of Health and Social Services, an entity within the State of Delaware, Defendants.
Civ. A. No. 91-436 MMS.
United States District Court, D. Delaware.
August 27, 1992.
*1113 *1114 Stephen F. Dryden, Heckler & Cattie, Wilmington, Del. (Lewis H. Robertson, Evans, Osborne & Kreizman, Little Silver, N.J., of counsel), for plaintiffs.
James J. Hanley, John K. Welch, and Kevin R. Slatterly, Deputy Attys. Gen., State of Del. Dept. of Justice, Wilmington, Del., for defendants.

OPINION
MURRAY M. SCHWARTZ, Senior District Judge.
Plaintiffs filed suit seeking a judgment declaring unconstitutional and granting permanent injunctive relief from two recently enacted amendments to a Delaware statute regulating adult entertainment establishments. The statute regulates closing hours and imposes open-booth requirements on adult entertainment establishments. Defendants filed a cross-motion for summary judgment urging the Court to uphold the constitutionality of the amendments and deny permanent injunctive relief. Defendants' cross-motion for summary judgment will be granted and plaintiffs' motion for summary judgment denied.

I. The Facts

Plaintiff Bob's Discount Adult Books, Inc. ("Adult Books") is a Delaware corporation which owns and operates an adult entertainment establishment at 174 South DuPont Highway in the County of New Castle, Delaware.[1] Plaintiff Francis R. Mitchell ("Mitchell") is an officer, director and principal stockholder of Adult Books.
Directly across South DuPont Highway from Adult Books' location is a residential area known as Midvale. Some residences share their rear lot lines with the right-of-way of South DuPont Highway.
Since March, 1976, Adult books has offered for sale books, magazines, films and novelties of an adult nature and until recently had provided adult entertainment in the form of film and video presentation in enclosed booths. From about 1976 until 1985, Adult Books also offered live entertainment viewed by a patron from an enclosed booth. The live entertainment was of a sexually explicit nature.
Each of Adult Books' booths is designed for the provision of entertainment, either in the form of a brief presentation of a film, video or a live act. Until recently, each booth was equipped with a door which affords privacy to a patron and screens out light, noise and distractions from persons passing by.
After some two or so years of slowly establishing patronage, Adult Books has been visited by between 200 to 500 patrons in a typical day. Until recently, Adult Books was open to the public from 10:00 a.m. Monday through Saturday until 3:00 a.m. the following day, and from 10:00 a.m. on Sunday until 2:00 a.m. the following day. Adult Books typically closed at 6:00 *1115 p.m. on Christmas Eve until 10:00 a.m. on the day following Christmas, and closed at 6:00 p.m. on New Year's Eve. Otherwise, Adult Books remained open during its normal business hours for all other holidays in the absence of any unusual staffing or other problems.
In 1977, the Delaware General Assembly adopted 24 Del.C. Ch. 16, now known as the Adult Entertainment Establishments Act (the "Act"). The Act established the defendant Commission on Adult Entertainment Establishments (the "Commission"),[2] defined "adult entertainment establishments" to include establishments such as Adult Books and imposed a requirement that persons who engage in the operation of such an establishment first obtain a license therefor from the Commission and comply with certain other provisions and restrictions. The Act further provides for criminal penalties for those who operate an adult entertainment establishment without a license or otherwise violate requirements of the Act.[3]
On June 5, 1991, the Delaware General Assembly enacted Senate Bill No. 163, amending 24 Del.C. § 1625 by adding a new sub-section limiting hours of adult entertainment establishments to 10:00 a.m. through 10:00 p.m. Monday through Saturday. In addition they must remain closed on all Sundays and holidays.[4] Contemporaneously the General Assembly enacted Senate Bill No. 164, adding new sub-chapters, including 24 Del.C. § 1633(b), prohibiting booths used for the viewing of motion pictures or other forms of entertainment from having doors, unless one side is open to an adjacent public room so that the area inside is visible to persons in the adjacent room.[5]
The synopsis that accompanied Senate Bill No. 163 provides:
This Act provides certain time restrictions for adult entertainment establishments. In addition, this Act limits the operation of adult entertainment establishments to the hours of 10:00 a.m. and 10:00 p.m. Mondays through Saturdays; it requires such business to remain closed on Sundays and holidays.
Courts have upheld such time restrictions, and found that they may, in fact, further a significant community interest in promoting the welfare of a community's neighborhoods. One court noted that such time restrictions, which permit an adult entertainment establishment to remain open fourteen hours per day, six days per week, did not suppress or ban sexually-explicit materials from the community, and were not manifestly arbitrary. *1116 The case referred to in the synopsis apparently is Star Satellite v. City of Biloxi, 779 F.2d 1074 (5th Cir.1986). The ordinance challenged in Star Satellite was adopted "after extensive study by the City of Biloxi." Id. at 1077. In addition, Senator McBride, the sponsor of the legislation, explained the rationale of Senate Bill No. 163 as follows:
Senate Bill No. 163 is an attempt ... by legislators from affected areas and others to allow the citizens in their community, if you will, to recapture their community. The adult entertainment establishments, particularly ones in my Senatorial District and nearby, unfortunately, were put into place and established before the adult entertainment laws were re-written by myself, Representative Spence and others back in the early '80s and in several cases they abut residential communities. In fact, our neighbors, if you will, of residential homes where families (inaudible)[6] the establishments have become an absolute nuisance to the community in the form of additional traffic and many, many other activities that take place unfortunately in the area because of these establishments. This bill before us now attempts to regulate, if you will, the hours of operation from in the morning until 10 p.m. to be closed Sundays and on legal holidays. We believe that while the law allows these establishments to operate, we believe that we also have a right to set some reasonable hours of operation so that the neighborhoods can get some peace and quiet at least part of the day....
App. to Pl.Br. at 32a.
The synopsis accompanying Senate Bill No. 164 provides:
Magazine and newspaper articles, from time to time, contain articles relating to `anonymous sex' which takes place within certain adult entertainment establishments or similar places. It is the basic premise of this Act that such conduct is conducive to the spread of communicable disease; and is not only a danger to persons frequenting the adult entertainment establishments, or those engaged in such conduct, but it is also of danger to the pubic [public]....
In addition, Senator McBride told the Senate that:
This is a very serious piece of legislation for a number of reasons. And we did a lot of research with it and got a lot of help in developing the legislation and there has been some question in the past in other states about whether or not an open booth law ... is constitutional and we have found through research that that has been upheld in federal courts....
App. to Pl.Br. at 42a (emphasis added).
Subsequent to the passage of the legislation, Ms. Pasqualine Robison, one of the members of the Commission and a resident of Midvale, testified she had discussed with Senator McBride, prior to the passage of Bill No. 163, the various problems caused by adult entertainment establishments to the surrounding community. This included noise, traffic, parking and the performance of sexual acts in the community. Dep. of Pasqualine Robison, App. to Pl.Br. at 74a. Joann Christian, another member of the Commission and resident of Midvale, also testified that she had discussed with Senator McBride, prior to the passage of the legislation, problems caused by adult entertainment establishments, such as noise, excessive parking and the discarding of sexually oriented material on lawns. Dep. of Joann Christian, App. to Pl.Br. at 108a. Ms. Christian also testified that she discussed with Senator McBride the possibility of curtailing the hours of adult entertainment establishments to address these problems. Id. at 112a.
The plaintiffs have limited the hours of the operation of Adult Books and have completely removed the doors of the booths used for the presentation of live, film or video entertainment in compliance with the challenged provisions of the Act. Plaintiffs complain that these two measures have resulted in a dramatic decrease in patronage to the establishment. Plaintiffs *1117 assert patronage has diminished because the establishment is now closed at popular times and patrons are not willing to utilize booths without doors because they are distracted by light, noise, passers-by, or because they are unwilling to view sexually explicit material when they, as well as their choices of materials, are exposed to public view. Plaintiffs claim that as a result Adult Books is threatened with imminent demise and Mitchell is similarly threatened with ruinous financial consequences.
Plaintiffs contend that Senate Bill No. 163 and No. 164 constitute violations of the First and Fourteenth Amendments of the United States Constitution as improper abridgments of speech. Plaintiffs therefore seek a judgment declaring Senate Bill No. 163 and No. 164 unconstitutional and granting permanent injunctive relief from the closing hours and open-booth regulations.

II. Summary Judgment Standard

Summary judgment will be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). When the moving party has discharged this burden, the "nonmoving party must come forward with `specific facts showing that there is a genuine issue for trial.'" Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
To meet the summary judgment burden, therefore, there must be no dispute as to a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Substantive law defines which facts are "material," and only disputes over facts that might affect the outcome of the suit will defeat summary judgment. Id. A factual dispute is deemed genuine "if a reasonable jury could return a verdict for the nonmoving party." Id.; see also Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir.1989) (non-movant must produce more than mere scintilla of evidence to successfully oppose summary judgment). Inferences are construed in the light most favorable to the non-movant and doubts as to the existence of genuine issues of material fact will be resolved against the movant. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 900 (3d Cir.), cert. dismissed, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).
This Court has framed the summary judgment standard as follows: "To resist Defendants' motion for summary judgment, Plaintiffs must come forward with sufficient specific facts to establish a genuine factual issue for trial." Cruz v. Chesapeake Shipping, Inc., 738 F.Supp. 809, 816 (D.Del.1990).

III. Discussion

A. The Analytical Framework
Plaintiffs urge that the closing hours and open-booth requirements are unconstitutional on their face and as applied to them. They contend these provisions of the Act will have the effect of substantially limiting the availability of sexually explicit entertainment in violation of the First and Fourteenth Amendments to the Constitution.
Although restrictions on protected speech are presumed unconstitutional if their purpose is to restrict speech because of its content, City of Renton v. Playtime Theatres, 475 U.S. 41, 46-47, 106 S.Ct. 925, 928-29, 89 L.Ed.2d 29 (1986), protected speech can be subject to reasonable time, place and manner restrictions. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Indeed, if it can be established that the "predominate concern" of the regulation is to address undesirable secondary effects of a speech-related activity, the regulation must then be measured against the traditional content-neutral time, place and manner restriction standard. Renton, supra, 475 *1118 U.S. at 48, 106 S.Ct. at 929-30 (City Council's "predominate concerns" were with the secondary effects of adult theatres, not with the content of the adult film themselves); Young v. American Mini Theatres, Inc., 427 U.S. 50, 70-72, 80, 96 S.Ct. 2440, 2452-53, 2457, 49 L.Ed.2d 310 (1976) (regulation nothing more than a limitation on the place where adult films may be exhibited; clear that Detroit was not embarked on an effort to suppress free expression).
According to the Supreme Court "[r]estrictions of this kind are valid provided ... they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels of communication of the information." Community for Creative Non-Violence, supra, 468 U.S. at 293, 104 S.Ct. at 3069 (1984). More specifically, Renton establishes a three-stage analysis to be applied to allegedly content-based statutes or ordinances to determine if they are constitutionally proper.[7] First, it must be ascertained whether the law is a time, place and manner regulation. If it is, then it must be determined whether it is content-neutral, i.e., directed at the secondary effects of the regulated activity. Finally, if the first two criteria are satisfied, the governmental authority must establish the statute is narrowly tailored to serve a substantial government interest and allows for reasonable alternative avenues of communication. Renton, supra, 475 U.S. at 47, 106 S.Ct. at 928-29.

B. Time, Place and Manner Regulation
In Renton, the Supreme Court stated that the challenged ordinance was properly analyzed as a time, place and manner regulation because the ordinance did "not ban adult theaters altogether, but merely provide[d] that such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school." Id. at 46, 106 S.Ct. at 928. Similarly, in this case, the statutory amendments are properly analyzed as time, place and manner regulations because they do not ban adult entertainment establishments entirely, but merely limit their hours of operation and impose an open-booth requirement  a physical limitation on the structure of viewing booths. These requirements, therefore, are properly analyzed as, respectively, time and manner regulations.

C. Content-Neutrality
Next, the Court must determine if the statutes are content-neutral. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, supra, 491 U.S. at 791, 109 S.Ct. at 2753-54 (citing Community for Creative Non-Violence, supra, 468 U.S. at 295, 104 S.Ct. at 3070). The controlling consideration in this inquiry is the government's purpose. Id. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Id. (citing Renton, supra, 475 U.S. at 47-48, 106 S.Ct. at 927-29). As long as the governmental regulation can be "justified without reference to the content of the regulated speech," it can be considered content-neutral. Id. (quoting Community for Creative Non-Violence, supra, 468 U.S. at 293, 104 S.Ct. at 3069) (emphasis removed).
The two challenged amendments can easily be justified without reference to the content of expression at adult entertainment establishments. The predominate *1119 concern of these two provisions of the Act is unrelated to the suppression of free expression. Rather, the concern is targeted at the secondary effects of adult entertainment establishments on the surrounding community, as in Renton and American Mini Theatres, and on public health. The statutes are designed to protect neighborhood tranquility, the community's quality of life and public health. This Court perceives nothing in the record to suggest that the General Assembly passed the amendments because of disagreement with the content of the material and entertainment sold or shown at adult entertainment establishments. Moreover, these legislative provisions make no distinction between types of films, videos or other forms of entertainment. The open-booth restrictions, for example, apply to showings of `Heidi' or `Mary Poppins' as well as the standard erotica fare.
As in Renton, therefore, the statutes are "completely consistent with our definition of `content-neutral' speech regulations...." Renton, supra, 475 U.S. at 48, 106 S.Ct. at 929. These statutes do not contravene the Renton rule "that `government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" Id. at 48-49, 106 S.Ct. at 928-29 (quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-90, 33 L.Ed.2d 212 (1972)). The Court finds that both the closing hours and open-booth statutes are content-neutral.

D. Substantial State Interests
Having determined that the challenged statutes are content-neutral time, place and manner regulations, the Court must determine whether the General Assembly was pursuing a substantial government interest in promulgating the closing hours and open-booth statutes.
At the outset, it is noted the First Amendment interest asserted by plaintiffs, namely, that the closing hours and open-booth restrictions impinge upon the presentation of erotic communication, involves "only the barest minimum of protected expression." Envy Ltd. v. City of Louisville, 734 F.Supp. 785, 786 (W.D.Ky.1990) (quoting California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972)). A plurality of the Supreme Court has recently held that nude dancing is only marginally protected by the First Amendment's guarantee of free expression. Barnes v. Glen Theatre, Inc., ___ U.S. ___, ___, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991). Because "[e]ven within the area of protected speech, a difference in content may require a different governmental response," Young, 427 U.S. at 66, 96 S.Ct. at 2450, the relatively minimal First Amendment interest asserted here requires a correspondingly lesser showing by the State to justify the burden imposed. In other words, because the First Amendment interest asserted is a minimal one, the State will not be held to an "unnecessarily rigid burden of proof" to justify the regulation. Envy Ltd., supra, 734 F.Supp. at 789 (citing Renton, supra, 475 U.S. at 50, 106 S.Ct. at 930).
Defendants urge the effect on speech here is incidental to regulations aimed at the secondary effects of a business whose activities are within the legitimate scope of the state's police power. The Court may not accept a naked assertion by the State as to the purpose of the legislation. Rather, the Court must determine whether during the legislative process there was objective evidence, typically in the form of a study or finding, demonstrating the purpose of the amendment was to address the purported secondary effects. Renton, supra, 475 U.S. at 50-51, 106 S.Ct. at 930. Requiring such findings reduces the risk that an ostensible effort to regulate secondary effects is in fact undertaken for the purpose of regulating content. Evidence of substantial state interest, therefore, is supported by proof that secondary effects actually exist and result from the activities of the category of businesses governed by the regulations.
As the Supreme Court explained in Renton, a locality may establish its "substantial interest" in the regulation by compiling a record with evidence that it may be "reasonably *1120 believed to be relevant to the problem that the city [or state] addresses." Renton, supra, at 51-52, 106 S.Ct. at 930-31. The Supreme Court noted, however, "[t]he First Amendment does not require a city [or state], before enacting such an ordinance [or statute], to conduct new studies or produce evidence independent of that already generated by other cities," so long as it is relevant to the locality's problem. Id. at 51, 106 S.Ct. at 930. Moreover, the court does not inquire whether the legislator subjectively believed or was motivated by other concerns, but rather whether an objective legislator could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose may be demonstrated by reasonable inferences from local studies or the experiences of other states, as well as from the specific testimony of individuals. Id. This degree of scrutiny best accommodates the need to insure proper purposes with the limited ability of courts to discern legislative motivations.
The record reflects that the Delaware General Assembly, although perhaps in a cursory fashion, considered the relationship between sexually-oriented businesses and their effects on the surrounding communities. Although the record is not replete with pre-enactment evidence to support the challenged regulations, judicial inquiry of whether the General Assembly reasonably believed the regulations to be relevant to the asserted problems "goes only to whether the legislative determination of justification and fitness is not facially without factual support, hence not arbitrary and capricious." Wall Distributors, Inc. v. City of Newport News, Va., 782 F.2d 1165, 1169 (4th Cir.1986).
The General Assembly's purpose to reduce the secondary effects of adult entertainment establishments is expressed in the legislation itself. The stated purpose of the General Assembly in enacting Section 1625(b) was clearly outlined in the Synopsis attached to Senate Bill No. 163. The General Assembly noted that time restrictions on adult entertainment establishments had been found to "further a significant community interest in promoting the welfare of a community's neighborhoods." Similarly, the General Assembly's stated purpose in enacting Section 1633(b)(2) is restated in Section 1631, Statement of Purpose and Findings, of the statute itself.[8]
A review of Section 1631 indicates that the General Assembly passed this legislation with the express statutory purpose of "eliminat[ing] the possibility of the spread of, or infection by, communicable diseases." The General Assembly was targeting the spread of AIDS, a fatal communicable disease, and regulating buildings "where persons might place themselves at risk of infection from the disease, or from any other communicable disease facilitated by high risk sexual conduct."
When Senator McBride introduced the two pieces of legislation in the General Assembly, he noted that research and *1121 study had gone into the development of the legislation and studies conducted by at least one other locality were referred to, albeit obliquely.[9]
The plaintiff discounts as post-hoc rationalizations the Robison and Christian deposition testimony supporting the rationality of the closing hours and open-booth requirements which was added to the record after the statutes were enacted by the General Assembly. In their depositions, Ms. Robison and Ms. Christian testified that adult bookstores contributed to noise levels, traffic, parking congestion, the performance of sexual acts and littering of sexually oriented material in adjacent residential neighborhoods. These statements, however, were not simply post-hoc descriptions of the problems associated with adult entertainment establishments. Rather, they referred to discussions the women had with Senator McBride before the legislation was passed. This indicates that an investigation into the problems posed by adult entertainment establishments had been conducted prior to the enactment of the legislation, at least with regard to Senate Bill No. 163.[10]
Moreover, the Court of Appeals for the Fourth Circuit has noted:
[a] cursory review of the case law reveals that courts have routinely admitted evidence at trial to supplement a legislative record or explain the stated interests behind challenged regulations. It would appear from reviewing the Renton case, for example, that testimony of this nature was admitted at trial and considered on appeal.
11126 Baltimore Blvd. v. Prince George's County, Md., 886 F.2d 1415, 1425 (4th Cir. 1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990). See also 15192 Thirteen Mile Road, Inc. v. City of Warren, 626 F.Supp. 803, 816-17 (E.D.Mich.1985) (post-hoc testimony at trial used to show adult uses are a source of urban blight). The appellate court went on to assert that supplemental materials cannot sustain regulations where there is no evidence in the pre-enactment legislative record. Where there is some evidence, however, it can be considered. Id. Such is the case here.
Contrary to plaintiffs' assertions, the record does not support the existence of any intention by the General Assembly to suppress the content of the expression at adult entertainment establishments either by restricting hours or establishing open-booth requirements. These requirements of the amendments do not ban the sale or exhibit of sexually explicit entertainment. The two disputed provisions merely regulate the time and manner in which the entertainment may be provided. This Court is *1122 persuaded the state has met its burden under Renton to show substantial and legitimate legislative interests; the General Assembly had evidence before it from which it was entitled to reach its conclusion and which was believed to be "relevant to the problem that the [state] address[ed]." Renton, supra, 475 U.S. at 51-52, 106 S.Ct. at 930-31. The Court holds, therefore, that the state has sufficiently demonstrated substantial governmental interests in the subject matter addressed by 24 Del.C. §§ 1625(b) and 1633(b).[11]

E. Narrow Tailoring
Plaintiffs also argue that the state has failed to prove the challenged statutes are narrowly tailored to meet substantial state interests. According to plaintiffs, there is no actual connection between the closing hours regulation and the state's asserted interest to lower noise levels from the parking lots of adult entertainment establishments, stop patrons from driving and walking through adjacent residential neighborhoods and stop patrons from performing sexual acts and discarding sexually-oriented material in the neighborhoods, because the patrons at Adult Books do not disturb the surrounding community. Plaintiffs claim that because Adult Books is relatively insulated from the residential community by the highway, their patrons do not pose these problems. Plaintiffs concede that the adult entertainment establishments located on the southbound side of South DuPont Highway may contribute to the problems the legislation seeks to address. They contend, however, that because Adult Books is located on the northbound side of the eight-lane divided highway, its patrons do not venture into and disturb the residential neighborhood on the southbound side of the highway. The argument continues that the closing hours requirement, as opposed to some other restriction on operation, or none at all, is not narrowly tailored to serve the state's interest. Renton makes clear that the legislative restriction be designed "to affect only the category of theaters [or adult entertainment establishments] shown to produce the unwanted secondary effects...." Renton, supra, 475 U.S. at 52, 106 S.Ct. at 931. (emphasis added). Since the state has shown that the category of adult entertainment establishments produces the unwanted secondary effects, it need not prove that Adult Books is specifically responsible for the deleterious impact on the Midvale community.
Although the Supreme Court has required "narrow tailoring" even within the area of content-neutral regulations, see, e.g., United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (ruling that a content-neutral restraint is valid only if "the incidental restriction on alleged First Amendment Freedoms is no greater than is essential to the furtherance of that interest"); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980), it is not *1123 clear what level of exactitude is appropriate.[12] However, "the city [or state] must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." American Mini Theatres, supra, 427 U.S. at 71, 96 S.Ct. at 2453.
In Renton, opponents of the challenged ordinance urged that the City failed to prove narrow tailoring because the City did not show that its method of regulation, concentrating the businesses away from other uses, was more appropriate than dispersing the businesses from each other. This argument, however, did not persuade the Supreme Court. The Court instead determined that the method chosen by the city fell within the ambit of the city's legislative discretion:
It is not our function to apprise the wisdom of [the city's] decision to require adult theatres to be separated rather than concentrated in the same areas.... [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.
Renton, supra, 475 U.S. at 52, 106 S.Ct. at 931 (quoting American Mini Theatres, supra, 427 U.S. at 71, 96 S.Ct. at 2453).
The circuit courts have struggled to define the narrowness required in an otherwise valid time, place and manner regulation. At one extreme, the Court of Appeals for the Seventh and Eighth Circuits require that a time, place or manner restriction be sufficiently narrow that it uses the "least restrictive means" available to achieve the government's interest. See City of Watseka v. Illinois Public Action Council, 796 F.2d 1547, 1554 (7th Cir.1986), aff'd, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972, and Association of Community Organizations for Reform Now v. City of Frontenac, 714 F.2d 813, 818 (8th Cir.1983). This restrictive approach, however, is inconsistent with the Supreme Court's analysis in Renton.
At the other end of the spectrum, the Court of Appeals for the Third Circuit held in Tacynec v. City of Philadelphia, 687 F.2d 793 (3d Cir.1982), cert. denied, 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (1983), that any narrowness requirement is satisfied as long as the regulation meets the second prong of the content-neutral analysis that it leaves open ample alternative avenues of communication. Id. at 797-98. See also New Jersey Citizen Action v. Edison Township, 797 F.2d 1250, 1255 (3d Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 186 (1987) (narrow tailoring not included as an element of the time, place and manner test in the Third Circuit). Moreover, narrow tailoring is less important when the potential for over-breadth burdens a category of speech, such as sexually-oriented expression, which is subject to less than the full First Amendment protection afforded political debate. Barnes v. Glen Theatre, Inc., supra, ___ U.S. at ___, 111 S.Ct. at 2470 (1991) (citing American Mini Theatres, at 70, 96 S.Ct. at 2452).[13]
The Court will not second guess the General Assembly's reasonable decision that the closing hour requirements are the most appropriate way to meet the state's objective of lessening the adverse secondary effects of adult entertainment establishments. The state must be permitted a reasonable opportunity to experiment with solutions to serious problems. This Court finds that the General Assembly has enacted a closing hours requirement that is narrowly tailored to the state's interest to satisfy the First Amendment.[14]
*1124 Plaintiffs also assert that the open-booth requirement is not narrowly tailored to serve the government's substantial interest. As the Wall Distributors court observed, however, "[t]he open booth regulation appears to be the least burdensome means of controlling offensive and illegal activity within the booths that can be imagined." Wall Distributors, supra, 782 F.2d at 1170.
Plaintiffs contend the concern of the state to insure the booths are not being used for the performance of sexual acts and the spread of AIDS can be accomplished by removing the bottom two feet of the door while preserving the viewing privacy of the patron. Plaintiffs' proposed alternative, however, is not persuasive. Plaintiffs' proposal would do little to inhibit sexual activity between booths through holes in the common dividing partitions.
The open-booth restriction applies only to the physical structure of the rooms in which the entertainment is displayed. This statute does not regulate the content of the communicative activity, nor does it infringe on the rights of patrons who wish to view this entertainment. There is absolutely nothing in the statute which limits the availability of films, videos or live entertainment. Although some patrons may be inhibited from viewing sexually-explicit entertainment from open booths, the statute does not bar anyone from viewing such entertainment from individual enclosures. The viewing public is in no way "denied access to the market ... or ... unable to satisfy its appetite for sexually explicit fare." American Mini Theatres, supra, 427 U.S. at 62, 96 S.Ct. at 2448.
The open-booth regulation furthers Delaware's substantial government interest in curbing the spread of AIDS. The General Assembly could reasonably conclude that some peep-show patrons would be more likely to engage in sexual activity with one another behind closed doors than in open cubicles. Accordingly, the Court finds that Delaware has satisfied the Renton narrow tailoring standard. Like the closing hours regulations, the open-booth regulation easily satisfies the requirement that the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985).

F. Alternative Avenues of Communication
With respect to the final prong of the Renton test, plaintiffs assert the Act does not leave open reasonable alternative avenues of communication because the closing hours requirement restricts the ability of the plaintiffs to offer and the public to purchase any form of adult entertainment as defined in the Act anywhere in the State of Delaware on sixty-four days of the year (fifty-two Sundays and twelve designated state holidays). In addition, on those days when an adult entertainment establishment is permitted to operate, it must remain closed between the hours of 10:00 p.m. and 10:00 a.m. the following day. Plaintiffs contend that because the purchase of adult entertainment is a leisure-time activity, patron demand is the greatest on the days and during the times when most people are not working  during the evenings, on weekends and on holidays. Accordingly, the closing hours regulation restrains the dissemination of adult entertainment on days and at times when the demand for it is high.
The closing hours requirement, however, does not create a broad ban on the dissemination of adult entertainment as it leaves such entertainment available for ten hours a day most days of the year. The closing restriction on the availability of adult entertainment may pose an inconvenience to some, or even many, patrons, but it nevertheless leaves open ample opportunities to sell and consume adult entertainment, thus satisfying the condition that reasonable alternative avenues of communication be left open.
*1125 Plaintiffs challenge the open-booth regulation on similar grounds. Plaintiffs imply there exists a privacy right permitting patrons to watch sexually-explicit entertainment in seclusion. They argue the loss of commercially available secluded booths will violate the condition that ample alternative avenues of communication for such material be left open. They assert the open-booth regulation significantly affects the ability and willingness of patrons to view the material because they will suffer discomfort or embarrassment if others observe them viewing sexually-explicit entertainment. They also urge the open-booth provision would expose their patron's tastes in viewing material to the public, which would apparently chill the patron's willingness to select from the full panoply of offerings.
Plaintiffs, however, cite no case supporting the existence of a privacy right to view erotic films in seclusion and the Court has found none. Traditionally the right of privacy encompasses and protects the personal intimacies of the home, the family, marriage, parenthood, procreation and child-rearing. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973). In Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court found a right of privacy in viewing obscene movies in one's own home. The Court in Paris, however, distinguished the privacy of one's own home from privacy in a commercial establishment. The Paris Court refused to find a privacy right "implicit in the concept of ordered liberty" to watch obscene movies in places of public accommodation. Paris, supra, 413 U.S. at 66, 93 S.Ct. at 2640. See also Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243, 1248 (9th Cir.1982).
In light of the Supreme Court's reasoning in Paris, and in the absence of case law establishing such a privacy right, this Court will not expand the right of privacy to include the right to watch sexually-explicit non-obscene films in completely enclosed booths in commercial establishments. Patrons at adult entertainment establishments are not precluded, except by their own sensibilities, from viewing erotic entertainment in open viewing booths.
The Act does not prohibit the movie-booth form of entertainment. It regulates only the manner in which such entertainment may be viewed, and its impact on First Amendment rights is incidental. Although patrons may prefer to utilize booths with doors, the Act in no way bars them from viewing any entertainment in individual cubbyholes. In the language of American Mini Theatres and Renton, this measure does not "suppress," or "greatly restrict access to," or "unreasonably limit," avenues of expression.[15]
The Court finds that, in the context of this action, patrons of adult entertainment establishments do not have a First Amendment right to the commercial, anonymous viewing of sexually-explicit entertainment. The alternative channels of communication for viewing sexually-explicit entertainment are ample and adequate.

IV. Conclusion

The Court finds the two amendments represent valid governmental responses to the "admittedly serious problems" created by adult entertainment establishments. *1126 American Mini Theatres, supra, 427 U.S. at 71, 96 S.Ct. at 2452-53. The Delaware General Assembly has not used the power to regulate as a pretext for suppressing expression. Here, similar to the situations in Renton and American Mini Theatres, the State of Delaware has enacted statutes which pursue the legitimate goals of protecting the health, welfare and safety of Delaware citizens and patrons of adult entertainment establishments, while simultaneously satisfying the dictates of the First Amendment.[16] Defendants' cross motion for summary judgment will accordingly be granted, and plaintiffs' motion will be denied.
NOTES
[1] South DuPont Highway, in the vicinity of Adult Books' location, is an eight-lane highway. Adult Books is located on the northbound side. It's nearest neighbor to the north is a Delaware State Police Barracks and its nearest neighbor to the south is a gasoline station. There are no uses other than commercial uses for a distance of at least two miles in either direction from Adult Books' location along the northbound side of South DuPont Highway.
[2] The other defendants include Charles M. Oberly, III, in his official capacity as Attorney General of the State of Delaware, the State of Delaware and the Delaware Department of Health and Social Services.
[3] In a Memorandum Opinion and Order dated January 3, 1991, this Court invalidated the Act's requirements that plaintiffs post a bond with surety of $10,000 in connection with their license application and the imposition of a $10,000 fine in connection with the revocation of their license to operate live entertainment booths.
[4] The amendment to the Act, Section 1625(b), states:

No adult entertainment establishment shall open to do business before 10:00 a.m., Monday through Saturday; and no adult entertainment establishment shall remain open after 10:00 p.m., Monday through Saturday. No adult entertainment establishment shall be open for business on any Sunday or holiday.
24 Del.C. § 1625(b).
[5] Section 1633(b) reads:

(b) No person shall own, operate, manage, rent, lease or exercise control over any commercial building, structure, premises or portion or part thereof, which contains:
* * * * * *
(2) booths, stalls, or partitioned portions of a room or individual rooms, used for the viewing of motion pictures or other forms of entertainment, having doors, curtains or portal partitions, unless such booths, stalls, partitioned portions of a room or individual rooms so used shall have at least one side open to an adjacent public room so that the area inside is visible to persons in adjacent public rooms. Such areas shall be lighted in a manner that the persons in the areas used for viewing motion pictures or other forms of entertainment are visible from the adjacent public rooms, but such lighting shall not be of such intensity as to prevent the viewing of the motion pictures or other offered entertainment.
24 Del.C. § 1633(b).
[6] Proceedings of the Delaware Senate and House are tape recorded.
[7] To resolve this dispute, the Court adopts the Renton time, place and manner analysis rather than the four-factor analysis used in Barnes v. Glen Theatre, Inc., ___ U.S. ___, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), which was adopted from United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Barnes analysis is appropriate for the circumstances where the government passes a law of general applicability, which incidentally affects a First Amendment right, such as the public nudity statute examined in Barnes. When the law affects First Amendment rights by singling out particular categories of establishments because of their adverse secondary effects, however, the Renton analysis is most appropriate.
[8] Section 1631 reads:

(a) It is hereby found that there are certain commercial premises, buildings, structures or parts thereof which, by reason of the design and use of such premises, buildings or structures are conducive to the spread of communicable disease to persons frequenting such premises, buildings and structures; and also to the public health, safety and welfare. The General Assembly declares that the health, safety and welfare of all persons in this State should be protected through the application and enforcement of standards regulating such premises, buildings and structures, in order to eliminate the possibility of the spread of, or infection by, communicable diseases.
(b) The sexually transmittable disease of Acquired Immune Deficiency Syndrome, currently found to be irreversible and uniformly fatal, is found to be of particular danger to persons who frequent adult entertainment establishments or other premises, when they are in violation of state law. A high incidence of this and other communicable diseases is found to occur in discernable population groups. The risk factors for obtaining or spreading A.I.D.S. are associated with high-risk sexual conduct. The commercial premises, buildings and structures where persons might place themselves at risk of infection from this disease, or from any other communicable disease facilitated by high-risk sexual conduct, should as public policy be regulated and standards for the prevention of the spread of these communicable diseases should be established for the protection of the public health, safety and welfare.
24 Del.C. § 1631.
[9] The Court of Appeals for the Fourth Circuit observed,

we find it reasonable for local legislative bodies to take notice or assume matters of common knowledge and experience. As countless cases addressed by this court and courts across the nation will confirm, there are notorious and self-evident conditions attendant to the commercial exploitation of human sexuality which do not vary greatly among generally comparable communities....
11126 Baltimore Blvd. v. Prince George's County, Md., 886 F.2d 1415, 1423 (4th Cir.1989), vacated on other grounds, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990). See also Wall Distributors, supra, 782 F.2d at 1169-70 n. 7. It is unlikely that legislators in the Delaware General Assembly were not aware of comparable conditions in other localities and of the responses to similar conditions attempted by other governments. The reference in the Synopsis to Bill No. 163 to Star Satellite, supra, which involved a similar closing hours restriction, indicates that this was indeed the case.
Also, in Wall Distributors, supra, the Court of Appeals for the Fourth Circuit affirmed, on a slim legislative record, a police power statute analogous to the open-booth statute at issue in the present controversy. In Wall Distributors, the appellate court upheld a criminal statute which imposed licensing requirements upon and made criminal the operation of closed-booth movie arcades. From all that appears in Wall Distributors, at the time the regulations were enacted, the City Council had little more before it than expressions of concern by citizens and government officials. The appellate court rejected the plaintiff's assertion that the city did not have sufficient evidence of the activities and health conditions in closed-booth arcades to provide an adequate basis to support the need for such regulations. Id. at 1169.
[10] Also, prior to the enactment of Bill No. 164, Senator McBride informed the General Assembly that "we did a lot of research" before drafting the bill.
[11] The plaintiff has cited the following cases as examples where courts have determined there was an inadequate factual basis to support content specific laws which restrict the exercise of free speech. School v. Borough of Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); Acorn Investments, Inc. v. City of Seattle, 887 F.2d 219 (9th Cir.1989); Tollis, Inc. v. San Bernandino County, 827 F.2d 1329 (9th Cir. 1987); Christy v. City of Ann Arbor, 824 F.2d 489 (6th Cir.1987), cert. denied, 484 U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988); Leverett v. City of Pinellas Park, 775 F.2d 1536 (11th Cir. 1985); 754 Orange Ave., Inc., City of West Haven, Conn., 761 F.2d 105 (2nd Cir.1985); Krueger v. City of Pensacola, 759 F.2d 851 (11th Cir. 1985); Kuzinich v. County of Santa Clara, 689 F.2d 1345 (9th Cir.1982); Basiardanes v. City of Galveston, 682 F.2d 1203 (5th Cir.1982); Avalon Cinema Corp. v. Thompson, 667 F.2d 659 (8th Cir.1981); Keego Harbor Co. v. City of Keego Harbor, 657 F.2d 94 (6th Cir.1981); Amico v. New Castle Co., 101 F.R.D. 472, 487 (D.Del. 1984), aff'd, 770 F.2d 1066 (3d Cir.1985); North Street Book Shoppe v. Village of Endicott, 582 F.Supp. 1428 (N.D.N.Y.1984); CLR Corp. v. Henline, 520 F.Supp. 760 (W.D.Mich.1981), aff'd, 702 F.2d 637 (6th Cir.1983); Ellwest Stereo Theatres, Inc. v. Byrd, 472 F.Supp. 702 (D.Tex.1977); E & B Enterprises v. City of University Park, 449 F.Supp. 695 (D.Tex.1977). This Court is not persuaded by any of the cases cited because the inquiry into an adequate factual basis is a fact-specific endeavor and the decisions handed down by these courts were all based on the particular factual circumstances of each case. The conclusions set forth in these cases, therefore, do not control in the instant case.
[12] See generally Geoffrey V. Stone, Content-Neutral Restrictions, 54 U.Chi.L.Rev. 46 (1987) (discussing various levels of review applied to content-neutral regulations).
[13] See text, supra p. 1119.
[14] One appellate court has upheld closing hours restrictions on adult entertainment establishments. See Star Satellite, supra. See also Harper v. Lindsay, 616 F.2d 849 (5th Cir.1980) (upholding closing hours requirement for massage parlors); Pollard v. Cockrell, 578 F.2d 1002 (5th Cir.1978) (same). However, in Kev, Inc. v. Kitsap County, 1983 WL 56 (E.D.Wash.), the District Court for the Western District of Washington held that a closing hours restriction on an exotic dance studio was unreasonable. The Court determined there was no justification for this requirement that the exotic dance studio remain closed between the hours of 10:00 p.m. and 8:00 a.m. because there was no evidence the patrons disturbed the community at late hours. There is, however, precisely such evidence in the instant case to justify closing hour requirements.
[15] Federal courts regularly uphold the constitutionality of open-booth requirements. See Bamon Corp. v. City of Dayton, 923 F.2d 470 (6th Cir.1991) (upholding constitutionality of open-booth requirement); Postscript Enterprises v. City of Bridgeton, 905 F.2d 223 (8th Cir.1990) (same); Doe v. City of Minneapolis, 898 F.2d 612 (8th Cir.1990) (same); 11126 Baltimore Blvd., supra (same); Berg v. Health and Hospital Corp. of Marion County, 865 F.2d 797 (7th Cir.1989) (same); FW/PBS, Inc. v. City of Dallas, 837 F.2d 1298 (5th Cir.1988) (same), aff'd in part, vacated in part, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); Wall Distributors, supra (same); Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243 (9th Cir.1982) (same). Furthermore, United States district courts have uniformly upheld open-booth regulations. See Greenberg v. Town of East Hartford, 736 F.Supp. 430 (D.Conn.1989) (upholding constitutionality of open-booth requirement), aff'd, 901 F.2d 297 (2d Cir.1990); Movie & Video World, Inc. v. Board of County Commissioners of Palm Beach County, Florida, 723 F.Supp. 695 (S.D.Fla.1989) (same); Suburban Video, Inc. v. City of Delafield, 694 F.Supp. 585 (E.D.Wis.1988) (same); Broadway Books, Inc. v. Roberts, 642 F.Supp. 486 (E.D.Tenn.1986) (same).
[16] Plaintiffs argue that the closing hours and open booth regulations adversely affect the profitability of their business. Renton, however, makes clear that even if constitutionally proper regulations affect the financial conditions of adult entertainment establishments, such establishments must nevertheless fend for themselves in the marketplace. Renton, supra, 475 U.S. at 54, 106 S.Ct. at 932.